1  Lawrence C. Ecoff, Esq. (SBN 143814)
   Philip H.R. Nevinny, Esq. (SBN 150506)
2  ECOFF BLUT, LLP
   280 South Beverly Drive, Suite 504
3  Beverly Hills, CA 90212
   Telephone: (310) 887-1850
4  Facsimile: (310) 887-1855
   ecoff@ecofflaw.com
5
   Attorneys for Defendant
6  SUSAN HUNG

7

8              UNITED STATES DISTRICT COURT

9         FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11 FAIR HOUSING COUNCIL OF          )  Case No.    SACV10-01079   CJC
   ORANGE COUNTY, INC, and          )  (RNBx)
12 ARLENE LEWIS,                     )
                                     )
13              Plaintiffs,          )  **DECLARATION OF PHILIP H.R.**
                                     )  **NEVINNY IN SUPPORT OF**
14      vs.                          )  **DEFENDANT'S MOTION FOR**
                                     )  **SUMMARY JUDGMENT, OR IN**
15                                   )  **THE ALTERNATIVE, PARTIAL**
   SAM CHANG, etc., et al.,          )  **SUMMARY JUDGMENT**
16                                   )
                Defendants.          )  **Date:** October 3, 2011
17                                   )  **Time:** 1:30 p.m.
                                     )  **Place:** Courtroom of the
18                                   )      Hon. Cormac J. Carney
19 _____  )
                                        Discovery Cutoff: July 1, 2011
20                                      Pretrial Conference: October 3, 2011
                                        Trial:              October 11, 2011
21

22

23         __DECLARATION OF PHILIP H.R. NEVINNY__

24      I, PHILIP H.R. NEVINNY, declare:

25      1.      I am an attorney at law, duly licensed to practice before all the Courts

26 of the State of California, and counsel to the firm of Ecoff, Blut, LLP, attorneys of

27 record for  Defendant Susan Hung in the above-entitled matter.  I have personal

28 knowledge of the facts stated in this declaration and, if called as a witness, could

                                   1

1    and would testify competently to those facts.   This declaration is submitted in

2    support of Defendant's Motion for Summary Judgment or in the Alternative, Partial

3    Summary Judgment.

4         2.    On June 29, 2011, I conducted the deposition of Arlene Lewis.  A true

5    and correct copy of excerpts of relevant portions of Ms. Lewis' Deposition

6    Transcript are attached hereto as Exhibit "A."

7         3.    A true and correct copy of a handwritten statement marked as Exhibit

8    "17" to the Deposition Transcript of Ms. Lewis is attached hereto as Exhibit "B."

9         4.    On June 29, 2011, I conducted the deposition of Dawn Rostagno.

10   A true and correct copy of excerpts of relevant portions of Ms. Rostagno's

11   Deposition Transcript are attached hereto as Exhibit "C."

12         5.    A true and correct copy of a Tester Assignment Form - Rentals marked

13   as Exhibit "25" to the Deposition Transcript of Ms. Rostagno is attached hereto as

14   Exhibit "D."

15         6.    On July 11, 2011, I conducted the deposition of Patricia McNeal.  A

16   true and correct copy of excerpts of relevant portions of Ms. McNeal's Deposition

17   Transcript are attached hereto as Exhibit "E."

18         7.    On June 28, 2011, I conducted the deposition of Angelica Coronel.

19   A true and correct copy of excerpts of relevant portions of Ms. Coronel's

20   Deposition Transcript are attached hereto as Exhibit "F."

21         8.    A true and correct copy of a Fair Housing Council of Orange County

22   Damages Worksheet marked as Exhibit "15" to the Deposition Transcript of Ms.

23   Coronel is attached hereto as Exhibit "G."

24         9.    On June 28, 2011, I conducted the deposition of Denise Cato.  A true

25   and correct copy of excerpts of relevant portions of Ms. Cato's Deposition

26   Transcript are attached hereto as Exhibit "H."

27         10.   On August 29, 2011, I conferred with counsel for Plaintiffs pursuant

28   to Central District Local Rule 7-3 regarding Defendant's intent to file the instant

DECLARATION OF PHILIP H.R. NEVINNY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1  Motion.  That meet and confer took place pursuant to my written request, facsimile

2  transmitted and mailed to Plaintiffs' counsel on August 23, 2011, requesting

3  Plaintiffs to stipulate to the issues and facts set forth in this Motion.  Counsel and I

4  were unable to resolve the issues raised without the necessity for this Motion.

5

6      I declare under penalty of perjury under the laws of the United States of

7  America that the foregoing is true and correct.

8

9      Executed on September 2, 2011 at _BEVERLY HILLS_ California.

10

11

12  PHILIP H.R. NEVINNY

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT A

1

2                    UNITED STATES DISTRICT COURT

3                    CENTRAL DISTRICT OF CALIFORNIA

4

      FAIR HOUSING COUNCIL OF  )
5     ORANGE COUNTY, INC. and  )
      ARLENE LEWIS,             )
6                               )
                  Plaintiffs,   )
7                               ) No.  SACV 10-01079-CJR
            vs.                 )
8                               )
      SAM CHANG and NINA CHANG, )
9     as Co-Trustees of CHANG   )
      FAMILY TRUST and SUSAN    )
10    HUNG,                     )
                                )
11                Defendants.   )
      ─────────────────────────)

12

13            DEPOSITION OF:  ARLENE LEWIS

14        TAKEN ON:  WEDNESDAY, JUNE 29, 2011

15

16

17

18

19

20

21

22

23

24    REPORTED BY:

25    PATRICIA L. HUBBARD, CSR #3400

```
1    years.

2              Then for two months I went to live with a

3    friend -- with some friends.

4         Q.   Okay.  And was that Ms. McNeal?

5         A.   Yes.

6         Q.   Okay.  In the early part of 2009 where

7    were you living?  Were you living in Los Angeles or

8    Orange County?

9         A.   Los Angeles.

10        Q.   He was Mr. Hertze your landlord?

11        A.   Yes.

12        Q.   Okay.  So at some point in 2009 did you

13   move to Orange County?

14        A.   Yes.

15        Q.   And what were the circumstances?  What

16   were the reasons for your move?

17        A.   I wanted to -- I wanted to get away from

18   my son.  I didn't want him to come over anymore.  So

19   if he didn't know where I lived, he wouldn't know

20   where I -- he couldn't come over.

21        Q.   Which son was that?

22        A.   The 31-year old.

23        Q.   Tommy Joseph?

24        A.   Yes.

25        Q.   All right.  I don't want to pry.
```

1       **Q.**   Okay.  So, what month in 2009 did you move

2   to Orange County?

3       **A.**   June -- the month of June I moved to

4   Orange County.

5       **Q.**   For the record, the witness just appeared

6   to be signing to her son.

7               Does your son have a hearing disability?

8       **A.**   No.

9       **Q.**   Oh, okay.

10              So, in June 2009 you moved down to Orange

11  County with your son?

12      **A.**   Yes.

13      **Q.**   With Tobby?

14      **A.**   Yes.

15      **Q.**   And where did you reside at that time?

16      **A.**   In Fullerton.

17      **Q.**   Did you rent an apartment at the time?

18      **A.**   No.

19      **Q.**   With whom were you living?

20      **A.**   With Patricia McNeal and Lawrence McNeal.

21      **Q.**   And you and Tobby were both residing at

22  the McNeals' residence?

23      **A.**   Yes.

24      **Q.**   Was that an apartment or a house?

25      **A.**   A house.

1    would give me the PennySaver booklet with rental

2    properties.

3              I would make appointments, pay money for

4    applications, and I would be told the apartment has

5    been rented.  And it was an ongoing thing.

6              And I couldn't understand why, because I

7    have good credit, no criminal background.  I had the

8    means -- the financial means.  I had all the

9    qualifications to get an apartment, and I couldn't get

10   one.  Didn't know why.

11        Q.   How many times between June 2009 and

12   November 2009 were you turned down seeking an

13   apartment?

14        A.   Well, estimating, approximately 20 times.

15        Q.   20 times?

16             And what neighborhoods were you looking

17   for an apartment in those 20 times that you were

18   turned down?

19        A.   Most -- I don't know the limit lines of

20   the cities, but most of them were in Fullerton, Buena

21   Park, and other surrounding cities.  Downey, Norwalk.

22        Q.   During these 20 times, were these actual

23   visits that you made to go look at an apartment on 20

24   occasions?

25        A.   Yes.

1      **A.**   No.

2      **Q.**   Do you suspect that this particular

3    landlord on Imperial didn't represent to you because

4    your son Tobby is disabled?

5      **A.**   Yes.  Because he asked about the S.S.I.

6    He asked about his disability.

7      **Q.**   And then you shared the story with him?

8      **A.**   Yes.

9      **Q.**   What did you tell him exactly?

10     **A.**   Well, I had told him he was disabled.  And

11   so I -- I told him that he was a grown man that was

12   like a good baby.

13           And he -- he was gearing also questions

14   toward my son.

15     **Q.**   So, what types of questions?

16     **A.**   How old is he?  Why you get S.S.I.?

17           And I told him that he was disabled.  I --

18   so he -- he -- it appeared he knew the law, in my

19   opinion.

20     **Q.**   What gave you that impression?

21     **A.**   Because he said -- he didn't tell me -- he

22   didn't tell me why he waived it.  I think he -- if he

23   told me, if he gave me a reason, I think -- I just

24   think he knew the law.

25     **Q.**   So he asked you questions geared toward

```
 1    that covered his area.

 2            And they didn't send out testers.  I don't

 3    know how they did it.  They came to the conclusion

 4    that it was inconclusive.

 5            I didn't -- I didn't go into the office,

 6    because I was getting burned out.

 7            My top priority was finding a place to

 8    live and not stressing myself out.

 9      Q.   Of course.  What month in 2009 did you

10    have that experience with this landlord on Imperial in

11    Downey?

12      A.   Pretty close to the same time I -- I would

13    say within a month that I spoke with the -- what is

14    it?  The defendant.

15      Q.   Okay.  So, approximately October?

16    Approximately?

17      A.   Approximately October or November, around

18    that time.

19      Q.   And did you actually go to the Fair

20    Housing Council's offices in Long Beach to lodge a

21    complaint regarding this particular landlord?

22      A.   No.  I did it over the phone.

23      Q.   All right.  Was it more than one telephone

24    call that you had with F.H.C. Long Beach?

25      A.   I don't remember.  If I got put on hold, I
```

1           Then all of a sudden he said, "You know, I

2    don't want you here.  I don't want you here because of

3    your son."  That's what he said.

4           So I figured, "Oh, well.  It's his place.

5    What can I do?"

6           So I left.  And I made a -- that's when I

7    made the complaint to the -- over the phone to the

8    Long Beach Fair Housing.

9       Q.   Was this before or after you contacted

10   them regarding the other apartment on Imperial?

11      A.   This was before.

12      Q.   And you spoke to the Fair Housing Council

13   in Long Beach and made a complaint regarding your

14   experience, correct?

15      A.   Yes.

16      Q.   What happened after that with the Fair

17   Housing Council in Long Beach?

18      A.   Inconclusive.

19      Q.   And how did you learn of that?  Who told

20   you?

21      A.   I had got a notice back.  I didn't go into

22   the office to make it formal the way I did here.

23      Q.   Do you recall the name of the person to

24   whom you spoke at the Long Beach Fair Housing Council

25   regarding Orchard Inn?

1   he'll be scaring the neighbors.  The police will be

2   coming.  He'll be walking around."

3            And I said, "But he's not -- he's not a

4   bad person."

5            And she said, "Well, you know what, I

6   don't want those kind of people here."  So she says,

7   "Well" --

8            So I asked her, I said, "Well, since we

9   had the appointment, could I -- can we still have the

10  appointment and I'll bring my son with me, and you can

11  see that he's not aggressive?  You'll see yourself

12  that he's a good quiet man."

13           "Oh, no.  Well, I'll tell you what.  I'll

14  talk to my husband, and I'll call you back."

15           I didn't think that she was going to call

16  me back.  I was beginning to leave it as that, oh,

17  well, now I know why -- well, now I believe I know why

18  I was being turned down these other times.

19           So to my amaze, she called me back.  She

20  says, "My husband and I, we decided that because -- we

21  decided not to rent to you, because we don't want

22  retarded people here."

23           And that was -- that was it.

24      Q.   So it's your testimony that Mrs. Hung

25  actually called you back specifically to tell you that

1          A.   Yes.

2          Q.   And was that the same day or a day later?

3          A.   I don't remember.

4          Q.   All right.  How long did the second

5     conversation take?

6          A.   I don't remember.

7          Q.   Ms. Lewis, didn't Mrs. Hung call you back

8     in order to invite you to look at an apartment at her

9     property?

10              MR. WARD:  Objection.  Misstates the

11    testimony, argumentative.

12              MR. NEVINNY:  I'm asking her if that's

13    what occurred.

14              THE WITNESS:  It's not the way you word

15    it.

16    BY MR. NEVINNY:

17         Q.   Oh, okay.  Please tell me in your own

18    words what she said.

19         A.   I was supposed to come by and see the

20    apartment.  But she changed her mind.  She didn't want

21    to have an interview with me after she found out my

22    son was retarded.

23         Q.   So on either occasion when you spoke to

24    Mrs. Hung she never invited you to come to the

25    property to inspect an apartment?

1          MR. WARD:  Objection.  Misstates prior

2    testimony.

3          THE WITNESS:  Never confirmed for me come.

4    BY MR. NEVINNY:

5      Q.   And the second time she called you back,

6    it's your testimony that she didn't call you back to

7    arrange for you to come visit the property?

8      A.   It was never confirmed.

9      Q.   Could you answer the question I'm asking?

10         When she called you back, did she not

11   offer to show you an apartment at the property?

12         MR. WARD:  Objection.  The question is

13   vague and ambiguous.

14   BY MR. NEVINNY:

15     Q.   You can answer if you understand the

16   question.

17     A.   I don't understand the way you're asking.

18   I don't understand.

19     Q.   You had a telephone conversation with

20   Mrs. Hung, and she offered to show you an apartment of

21   the property, but it was not confirmed?  That's your

22   testimony, correct?

23         MR. WARD:  Objection.  Misstates the

24   testimony.

25   ///

1          A.   Nothing.  I don't remember, but I probably

2     was still looking for -- in the papers, I was still

3     looking for apartments.  Because I was still in the

4     hotel.

5          Q.   So you continued your house search?

6          A.   Yes.

7          Q.   Now, at that time you said you were still

8     in the hotel.

9               In November 2009 you had moved from the

10    McNeals' residence?

11         A.   Yes.

12         Q.   Okay.  When was that?

13         A.   September the 1st I moved into the Ramada

14    Inn.

15         Q.   Where?

16         A.   On Imperial in Downey.

17         Q.   So let's go back to this last phone

18    conversation with Ms. Hung.

19              You didn't do anything after you hung up

20    the phone with her.  You continued your house search.

21              What happened after that in the ensuing

22    week, say?

23         A.   In the ensuing week?

24         Q.   Yeah.  In the following week after your

25    experience with Mrs. Hung, what did you do next?

1          A.    I don't remember the date, but I -- I went

2    to the Orange County Fair Hearing, and I informed her

3    about Susan.    And I continued to look for an

4    apartment.

5          Q.    How long after your telephone conversation

6    with Ms. Hung did you go to the Fair Housing Council

7    of Orange County?

8          A.    The date is on the application.    I don't

9    remember.

10         Q.    Do you remember approximately how long

11   between the time of that conversation and your going

12   into the Fair Housing Council offices of Orange

13   County?

14         A.    No.

15         Q.    Can you give me an estimate?

16         A.    No.

17         Q.    So it could have been a year later?

18         A.    No.

19         Q.    Okay.   So it was less than a year?

20         A.    Probably -- I don't know, but probably a

21   week or two.

22         Q.    A week or two later?

23         A.    I'm guessing.

24         Q.    Okay.   Well, I don't want you to guess.

25               Is it your estimate that it was a week or

1          A.    Because she then said, "S.S.I.?  S.S.I.?

2    What is wrong with him?"

3          And that to me was sending to me that she

4    had negative vibes about S.S.I. when she said "What's

5    wrong with him?"

6          Q.    So then the next line says,

7                "I said she didn't like it" -- "like

8                to rent to people with" -- I'm not

9                quite sure -- "with S.S.I."

10         So the next sentence reads,

11                "I said she didn't like to rent to

12                people with S.S.I."

13         You see that sentence?

14         A.    Which paragraph?

15         Q.    The last paragraph on the first page.

16         A.    She then sounded unimpressed.  I said --

17         Q.    So here's what I'm trying to understand

18    about what you wrote here.

19         When she sounded unimpressed, you then

20    told her she didn't like to rent to people with

21    S.S.I.?  Is that what occurred?

22         A.    No.  It was an error in writing.

23         Q.    Okay.

24         A.    That's -- she -- it should have been she

25    said.  It should have been she said.

1    types of damage she's seeking.  And I don't want to

2    guess at her damages claim.  So I don't think I can

3    ask it that open-ended, Counselor.

4              But I will do so in at least one area.

5    BY MR. NEVINNY:

6         Q.   Are you seeking compensation for mental

7    suffering in this case?

8         A.   Yes.

9         Q.   Okay.  After November 2009 did you have

10   any physical symptoms which you attribute to your

11   experience with Ms. Hung?

12        A.   When you mention the dates, I can't

13   remember what occurred on what dates, but I do know

14   after she told me "I don't want you -- I don't want to

15   rent the apartment to you because of your son," on

16   that day is when I -- I felt suffering, whatever day

17   that was.

18        Q.   And how did you feel the suffering?  How

19   did that manifest itself, if you understand?

20             How did you realize that you were

21   suffering?

22        A.   Because over the time I started feeling

23   sick, started having headaches, stomach aches.  When

24   I'd speak with friends, it was hard for me to stay

25   focused on the conversation, because I was thinking

1    about what she told me and how I'm in this room

2    suffering.

3              And it was -- I couldn't -- I couldn't

4    focus right.

5              I picked up 15 pounds because I -- I was

6    eating fast food.  And I started -- I started turning

7    to food for -- to make me feel better.

8              And I was having -- I was having dizzy

9    spells.  And I just felt -- I felt stomach aches.  I

10   just felt -- I just felt sick.  Because my hopes -- I

11   don't know.  My hopes -- she had my hopes built up.

12   And then as it just -- because she was unfair without

13   even giving me a chance -- I just felt real bad about

14   that.

15             Especially when I was in the -- in the

16   apartment with feeling like here it is, I'm locked --

17   I felt like I was lock up in a cage area.  I couldn't

18   do any better.

19             And it was like hard for me to believe I

20   was living like this when I wasn't supposed to be.  My

21   standards -- my standards of living, here I was

22   confined, couldn't do any better, living like an

23   animal.

24             And I just felt like I was the only -- I

25   was just feeling sick.  It was all in me.  It was like

1   replays of what she said to me.  And that's when I

2   started feeling sick and I started noticing the

3   difference in my comprehension, my weight and the way

4   I was feeling and the pains I was suffering.

5          They felt -- they felt physical to me, the

6   stomach aches, the headaches.  I just -- all I can say

7   is I just started feeling sick 24 hours a day.  I

8   wasn't the same person.

9   BY MR. NEVINNY:

10         Q.   Did you seek any medical treatment in

11  connection with all the symptoms you just described?

12         A.   No.

13         Q.   Did you see a doctor in connection with

14  how you felt sick?

15         A.   No.

16         Q.   Have you visited a psychiatrist in

17  connection with how you felt?

18         A.   No.

19         Q.   Have you visited a psychologist in

20  connection with how you felt?

21         A.   No.

22         Q.   Did you start feeling sick immediately

23  after you hung up the phone with Ms. Hung?

24         A.   I started feeling depressed then sick.

25         Q.   Where -- how long before you felt sick?

1               MR. WARD:  Objection.  That's invasive of

2     the witness's personal privacy, medical privacy.

3               MR. NEVINNY:  Well, that has to be

4     balanced against the need for the -- and relevance of

5     the discovery in this case which is that your client

6     is alleging mental anguish.

7               MR. WARD:  Well, certainly -- and to that

8     extent I think any medication that she's taking for

9     any conditions that she attributes to the conduct of

10    the defendants would be appropriate, but medications

11    she's taking for any unrelated physical issues would

12    not be relevant.

13    BY MR. NEVINNY:

14        Q.   Well, Ms. Lewis, you're on diabetes

15    medication, correct?

16        A.   Yes.

17        Q.   I'm not asking any questions about that

18    have.

19               I'm asking -- you stated that you

20    experience headaches after your experience -- your

21    telephone call with Ms. Hung.

22               Is that your testimony?

23        A.   Yes.

24        Q.   Do you take any medication in connection

25    with those headaches?

```
 1        A.    No.

 2        Q.    Do you continue to experience those

 3   headaches today?

 4        A.    When I have flashbacks, I do.  It's

 5   something that didn't leave -- what happened to me

 6   didn't leave my mind.  It's still -- sometimes it's

 7   like a nightmare and it comes back to me.

 8        Q.    How often do you have flashbacks?

 9        A.    I can't say.  I don't know.  They just

10   flare up.

11        Q.    When was the last time you had a flashback

12   regarding your experience in this case?

13        A.    Oh, when they told me about the -- they

14   just -- I had one about the deposition.  I had one --

15   I had some this week I know.  Because I had to, you

16   know, talk about -- you know, the memories were

17   brought up more so this week, because I had to go

18   to -- for the deposition that I knew was coming.

19        Q.    So when you say "this week," it's

20   Wednesday today.  Do you mean since Sunday or within

21   the last week, since last Wednesday?

22        A.    Well, I had them anyway, but I just had --

23   I really had one yesterday.

24        Q.    All right.

25        A.    But I have them -- I have them weekly.
```

1       A.    No.

2           Q.    Okay.  Other than watching television with

3     your son Tobby, are there any other activities that

4     you engage in together with Tobby?

5           A.    We go out to dinner.  We go for walks.

6     And we go house hunting.  Not apartment hunting, but

7     looking at houses.  That's -- that's what I do.

8           Q.    Okay.  How often do you go out to dinner

9     with your son Tobby?

10          A.    Excuse me.  But those are hard questions

11    for me.  When we feel like it.

12                I cook, but -- we have outings probably

13    about -- it's hard to say.  I can't answer to say when

14    I do it.  We just do it.

15          Q.    Is cooking something you enjoy?

16          A.    No.  But I do it.

17          Q.    Would you say you go out to dinner with

18    Tobby more than once a week?

19          A.    I would say once a week we go out to

20    dinner.

21          Q.    And how often would you say you take walks

22    with Tobby?

23          A.    Sometimes it's daily.  It's hard to say.

24    Sometimes it's every other day.

25          Q.    And is that when you actually look at

1           I, ARLENE LEWIS, say I have read the

2    foregoing deposition and declare under penalty of

3    perjury under the laws of the State of California:

4           That the foregoing is my deposition under

5    oath;

6           That I have read same and have made the

7    necessary corrections, additions or changes to my

8    answers that I deem necessary;

9           That my answers as indicated are true and

10   correct.

11

12           Executed at _____,

13   California, this _____ day of _____,

14   20_____.

15

16

17           _____

                      ARLENE LEWIS

18

19

20

21

22

23

24

25

# EXHIBIT B

FHC0013

Confidential

12/14/09

Paras

about two weeks before
Thanksgiving. November 2009

I drove past 8021 4th
Street an wrote down the
number from a rent sign
(name Susan on arm)
(714) 306-2348. I called and
left a message. She returned
my call.

I informed her about my
salary, which was $5,500 Gross.
She was impressed with my
salary. She then said she
have 3 apartment available.
Two at the above address and
one at ocean side or it a beach
front. She then asked me
my source of income. I
informed her that I retired
and I get SSI for my son
and I work for him.

She then sound unimpressed.
I said she like to rent to people
with SSI. They cause to much
trouble. She asked me, what's
wrong with him. I explained

Defts EXH. NO. 17 FOR I.D
TE: 6-29-11
TNESS: Lewis
PATRICIA L. HUBBARD
CSR NO. 3400

17

Page 2

that he's mentally retarded.
She asked what age is he. I
said 24 or 25. He had a birthday
11/21/09.

   She became upset and
said, no, no, no. He'll be
running around scaring
people I don't want the
police there. I can't watch
my son. She said all people
with a disable person don't
believe that they are trouble.
She then said nt and hung
up the phone.


Arlene Lewis

Confidential

FHC0014

# EXHIBIT C

1

2

3

4                    UNITED STATES DISTRICT COURT

5                  CENTRAL DISTRICT OF CALIFORNIA

6

FAIR HOUSING COUNCIL OF   )
7   ORANGE COUNTY, INC. and   )
ARLENE LEWIS,             )
8                             )
               Plaintiffs,   )
9                             ) No.   SACV 10-01079-CJR
        vs.                   )
10                            )
SAM CHANG and NINA CHANG,)
11   as Co-Trustees of CHANG  )
FAMILY TRUST and SUSAN       )
12   HUNG,                    )
                             )
13             Defendants.   )
_____)

14

15              DEPOSITION OF:  DAWNA ROSTAGNO

16            TAKEN ON:  WEDNESDAY, JUNE 29, 2011

17

18

19

20

21

22

23

24    REPORTED BY:

25    PATRICIA L. HUBBARD, CSR #3400

1    attached to this e-mail?

2         A.   Yes.

3         Q.   Okay.  And next I'm going to mark

4    collectively as Exhibit 25 documents FHC 136 through

5    FHC 146, the first two pages of which are entitled

6    "Tester Assignment Form - Rentals."

7              And then attached to that is a form

8    entitled "Fair Housing Council of Orange County Test

9    Report Form Rentals - Site Visit."

10             And although, Ms. Rostagno, I see you have

11   your own copy, I'll place this one before you, because

12   it's going to be part of the deposition transcript,

13   and ask you to review that.

14             (Off-the-record discussion.)

15        Q.   Ms. Rostagno, is this the assignment form

16   that you received in connection with 8142 Artesia

17   Boulevard from the Fair Housing Council of Orange

18   County on January 12, 2010, the first two pages?

19        A.   Yes.

20        Q.   And is the attachment your report that you

21   prepared in connection with the test you conducted

22   regarding 8142 Artesia Boulevard on January 12, 2010?

23        A.   Yes.

24        Q.   If I could ask you to turn to a page

25   stamped FHC 0095 at the bottom.

1           A.    And then we went over that together, yes.

2           Q.    Okay.  So she sent you the test?

3           A.    Yes.

4           Q.    And then you called her as per the

5    instructions on Exhibit 24?

6           A.    Yes.

7           Q.    Okay.  And then what happened next?

8           A.    We went over my profile together.  And I

9    left to do the test.

10          Q.    Okay.  So you hung up the phone and you

11   got in your car and drove to Artesia Boulevard?

12          A.    Yes.

13          Q.    So, according to your report at pages 86

14   and 87, you spoke with Norman, who you understood to

15   be the husband of Susan; is that correct?

16          A.    That's correct.

17          Q.    Okay.  And you got that information by

18   calling Susan, and you received that number from

19   Ms. Coronel, correct?

20          A.    Yes.

21          Q.    Okay.  So, one of the things that it says

22   here is you circled "yes" after the question "Do you

23   feel the agent treated you courteously?"

24                Do you see that?

25          A.    Yes.

```
 1              bedroom for me and my 21-year-old

 2              son.  I said he is disabled.  Norman

 3              stopped before we went to the

 4              apartment and said 'How is he

 5              disabled?  Because the apartment is

 6              upstairs.'"

 7         You see that?

 8    A.   Okay.

 9              "I am looking for a two bedroom" --

10              "for a two bedroom for me and my 21

11              year old son.  I said he is

12              disabled."

13         Yes.

14    Q.   So in response to your telling Mr. Hung

15  that your son was disabled, he asked "how is he

16  disabled" and then stated "because the apartment is

17  upstairs"?  That's what occurred?

18    A.   Yes.

19    Q.   Okay.  So, was it your impression that

20  Mr. Hung was asking whether your son was physically

21  disabled?

22    A.   Well, because it was upstairs, I'm --

23  yeah.

24    Q.   Okay.  Did he appear concerned about that?

25  Concerned with whether your son would be able to
```

```
 1              retarded.  As we walked up the

 2              stairs, as Norman was trying to open

 3              the door to the apartment number two,

 4              he said 'how is he retarded?'  I said

 5              'mentally.'"

 6        Is that accurate?

 7   A.   Yes.

 8   Q.   Okay.  The next line you write,

 9              "He said he could get in trouble for

10              asking, but since I brought it up, he

11              said years ago there was a lady who

12              lived here with her retarded son and

13              the cops were called because he went

14              running in the street."

15        Do you see that?

16   A.   Yes.

17   Q.   Is that accurate as to what Mr. Hung said?

18   A.   Yes.

19   Q.   What was Mr. Hung's demeanor as he was

20   telling you this?

21   A.   Worried, I guess.

22   Q.   At the time he said that, had you entered

23   the unit yet?

24   A.   I don't recall.

25   Q.   You don't recall if you were inside the
```

```
 1                      son, that he has a private nurse that

 2                      stays with him.  He said, 'so is he

 3                      home all day?'  I said 'yes.'"

 4            You see that?

 5       A.   Yep.

 6       Q.   Okay.  And is that accurate?

 7       A.   Yes.  Yes.

 8       Q.   The next line says,

 9                 "We then got into the apartment."

10            You see that?

11       A.   Yes.

12       Q.   Does that refresh your recollection as to

13   whether Mr. Hung asked about your son's condition and

14   told you the story about his other tenant before or

15   after you went into the apartment?

16       A.   It states here,

17                 "We then got into the apartment."

18       Q.   Okay.  So he asked about your mentally

19   disabled son, and then he told you the story about

20   this other tenant.

21            And then after that, you then proceeded to

22   enter into the apartment, correct?

23       A.   That's -- well, we then got into the

24   apartment.

25       Q.   I'm asking --
```

```
 1    of events?

 2         A.   I saw the apartment after he asked me

 3    about the kid.

 4         Q.   All right.   Turning to the next page Bates

 5    stamped FHC 0095, the first two line -- two lines

 6    read,

 7                   "I said this is perfect size

 8                   apartment for my son and me.  He said

 9                   this is a nice place for two adults."

10              Do you see that?

11         A.   Uh-huh.

12         Q.   So, did Mr. Hung say in response to your

13    statement that this was a perfect size apartment, this

14    is a nice place for two adults?  Was that the next

15    words he said?

16         A.   I said, "This is a perfect size apartment

17    for my son and me."

18              He said, "This is a nice place for two

19    adults."

20         Q.   Okay.  Did you have any conversation in

21    between those two statements?

22         A.   You know, I can't recall.  It says right

23    here, though,

24                   "I said this is a perfect size

25                   apartment for my son and me.  He said
```

1          A.    Yes.

2          Q.    And then you discussed a coupon for $50

3     off rent.

4                Did that also occur?

5          A.    He said that, yes.

6          Q.    Okay.  And you then write,

7                "I said "and the security deposit?'"

8                Does that mean to say that you said -- you

9     then asked about the security deposit?

10         A.    I said the security deposit -- yeah, I

11    said and the security deposit.

12         Q.    Right.

13         A.    Yes.

14         Q.    In other words, you said,

15                "I said 'and the security deposit?'"

16         A.    Yes.

17         Q.    I don't know if the transcript will

18    reflect that, but I understand.

19                And then once again you asked for certain

20    information, and Mr. Hung, in fact, provided you that

21    information, right?

22         A.    He said it would be $400 or $500, that

23    Susan knows all of that.

24         Q.    Okay.  And then you also discussed a

25    credit check fee.

1               You asked if there is a credit check fee

2       and he said yes.  You would have to ask Susan.  I

3       think it is $30 or $45 to ask her.

4               So in response to that question, also

5       Mr. Hung also provided you information, correct?

6       A.    Yes.

7       Q.    Okay.

8       A.    He said he thinks it's $30 or $45.

9       Q.    So next you write,

10              "I said it sounds great.  I would

11              like to turn in an application.  Do

12              you have one?"

13      Do you see that?

14      A.    Okay.  Wait now.

15      Q.    Actually let me back up.  I skipped a

16      line.

17      A.    Okay.

18      Q.    After he told you about the credit check

19      fee and to ask his wife, you write,

20              "He said they pay the trash and

21              water.  He also said there is a

22              one-car garage and a one-car space

23              for this apartment."

24      Do you see that?

25      A.    No.  I'm sorry.  My mind -- my eyes are --

1          Q.    Okay.  Did -- was that in response to a

2    question from you or did he volunteer that

3    information?

4          A.    Volunteer.

5          Q.    Okay.  And just before that you wrote,

6                    "He said they pay the trash and

7                    water."

8                Was that also something that he

9    volunteered?

10         A.    He said that, yes.

11         Q.    Okay.  Not in response to a question from

12   you?

13         A.    He said they pay the trash and water.

14         Q.    Okay.  So next you write,

15                    "I said it sounds great.  I would

16                    like to turn in an application.  Do

17                    you have one?"

18                And then you write,

19                    "He looked in the kitchen drawers and

20                    could not find one."

21                So you asked for an application, and the

22   next thing that Mr. Hung did was, according to your

23   report --

24         A.    Yes.

25         Q.    -- he looked for an application?

1          **A.**   Yes, he did look for one in the kitchen.

2          **Q.**   Okay.  And he could not find one; is that

3    also accurate?

4          **A.**   Yes.

5          **Q.**   Okay.  And then the next thing you write

6    is,

7                   "He said 'I think I have one in my

8                   car.'"

9                   Right?

10         **A.**   Yes.

11         **Q.**   Do you see that?

12         **A.**   Yes.

13         **Q.**   Is that accurate?

14         **A.**   If that's what it says here.

15         **Q.**   Is that what Mr. Hung said?

16         **A.**   That's what I wrote that he said, yes.

17         **Q.**   Okay.  So you wrote what he said?

18         **A.**   Yes.

19         **Q.**   And you said, "great," exclamation point,

20   apparently, right?  That's also true?

21         **A.**   Yes.

22         **Q.**   Okay.  The next line you write,

23                   "As we were walking out he asked

24                   again about my son.  He said, 'So is

25                   your son like 21 years old but acts

1          Q.   Right.   So both you and Mr. Hung then

2     proceeded to walk to his car?

3          A.   Yes.

4          Q.   Okay.   So, the next lines are then,

5                    "We then went to his car and he found

6                    the application.   It was on the seat.

7                    He said, 'Here is the application.

8                    You can fill it out and then call

9                    Susan.'"

10               Is that accurate?

11         A.   I remember him opening his car and seeing

12    it there.   That's what I remember.

13         Q.   And this was after he told you,

14                    "I think I have an application in my

15                    car"?

16         A.   That is what it says right here, yes.

17         Q.   Well, I know that's what it says here.

18               But is that what occurred?

19         A.   Yes.   If I wrote it, that's what occurred.

20         Q.   And then finally you write,

21                    "He then opened the gate so I can get

22                    in my car.   I said I would call Susan

23                    and fill out the application.   Thank

24                    you.   I left at 1:40 P.M."

25               You see that?

1              I, DAWNA ROSTAGNO, say I have read the

2       foregoing deposition and declare under penalty of

3       perjury under the laws of the State of California:

4        That the foregoing is my deposition under oath;

5       That I have read same and have made the necessary

6    corrections, additions or changes to my answers that I

7                      deem necessary;

8        That my answers as indicated are true and correct.

9

10    Executed at _____, California,

11       this _____ day of _____, 20_____.

12

13

14                 _____
                              DAWNA ROSTAGNO
15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D

## TESTER ASSIGNMENT FORM - RENTALS    Log #___09-022____

Case #_____

```
┌─────────────────────────────────────────────────────────────────────────────┐
│ IMPORTANT REMINDERS!                                                          │
│ ⇒ Be objective.  Personal bias or emotional reactions to the site visit may   │
│   invalidate the test results.                                                │
│ ⇒ Report ONLY FACTS, not personal perceptions or opinion.                     │
│ ⇒ You WANT this apartment, and you want it AS SOON AS POSSIBLE.                │
│ ⇒ If you are told there are no vacancies, ask about a WAITING LIST.            │
│ ⇒ Always make sure you find out the RENT, DEPOSIT AND CREDIT CHECK FEES.       │
│ ⇒ If shown an apartment, make sure you remember the UNIT NUMBER.               │
│ ⇒ Let the agent/manager DICTATE THE TONE of the site visit.  Don't be overly  │
│   aggressive or "chatty".  Don't volunteer a lot of information unless you     │
│   are instructed to do so.                                                    │
│ ⇒ Make sure you ask when the apartment will be READY FOR OCCUPANCY.           │
│ ⇒ Make sure you ATTACH ANY MATERIALS you get (business card, application,      │
│   brochure, etc.) to your test report form.                                   │
└─────────────────────────────────────────────────────────────────────────────┘
```

Tester's Name:_____Dawna Rostagno_____

Name and Address of Apartment Building or Complex:_____no name_____

_____8142 Artesia Blvd., Buena Park, California 90621_____

Telephone:_____

Call ahead to inquire about vacancies or set appointment? Yes -_____

Description of housing desired:    Number of Bedrooms:____2 Bd. 2bath.___

Monthly rent: $____$1300-____    First Choice:_____2Bd._____

Second Choice:_____2Bd._____

How you happened to come to this site:_____

_____driving by_____

## PERSONAL AND HOUSEHOLD CHARACTERISTICS (To be assumed for Test)

Name:_____Dawna Rostagno_____    Address:_____6225 Myra Avenue_____

_____Buena Park, CA 90620_____

Age:_____40_____  Marital Status:_____single____  # of Children:_____

Age and sex of Children:_____

Other persons in household:____mentally retarded son (21 yrs. old)_____

Household income:__$3800 +SSI (child)___    Source of Income:____Full time employment -

Occupation:_____    Employer:_____

Length of Employment: 5 yrs._____

When wish to move: A.S.A.P._____    Reason for moving:___want to relocate different complex

Attire:_____casual, but well put together_____

SPECIAL INSTRUCTIONS:  **This test is a drop-in on the complex located at 8142 Artesia Blvd. in the city of Buena Park.  You are checking for availability on a 2Bd. 2Ba unit. Please revealed your profile right away, this unit is for you and your mentally retarted 21 yr. old son. If asked anything about son state to her that he has a personal nurse who takes care of him full time and never had a problem he is a good son.  You work full time

Confidential

EXH. NO. 25 FOR I.D.

NESS: PATRICIA L. HUBBARD CSR NO. 3400

FHC0084

2 9

and if asked.  If ask if you want upstairs or do...stairs tell them you don't have a preferrence. Please obtained all the general information such as rent amount, security deposit, application fee, utilities, leasing requirements, amenities, credit check fee, SPECIALS and other fees. If asked why do you want to move tell them you want to move to a different complex in Buena Park.  This visit is just the initial step for you. Please note the leasing agent's mannerisms and demeanor.  * Ask for the opportunity to view unit(s)- Remember the unit(s) #s- * Obtain name and title of agent/manager providing information-  REMEMBER TO OBSERVED, LISTEN AND REPORT.

Confidential

FHC0085

**FAIR HOUSING COUNCIL OF ORANGE COUNTY**
**TEST REPORT FORM**

**RENTALS – SITE VISIT**

Log # _____09-022_____

Case # _____

Name of Tester _____Dawna Rostagno_____

Tester's Phone No.: ___714-606-1166___            Race ___white___   Nat'l Origin __u.s__

Address _____6225 Myra Ave Buena Park, Ca_____

_____

Address of Property Visited _____8142 Artesia Blvd_____

_____

City____ Buena Park _ State_ca_ Zip90621_ # of units don't know____

1.  Did you telephone ahead to inquire about an apartment?    xYes  .    θNo
    If yes, please complete Phone Contact Form.

2.  Test Date: ___Tuesday___     ___January___      /__12__ /2010__
                    Week Day              Month          Day     Year

    Time test began ___1:20 p.m___            Time test ended____1:40 p.m___

3.  Name & function of individual you spoke with: ___Norman-Susan husband not sure of___
    function _____

    How did you get the information?___ Called Susan, and she gave me her husbands name ___

    Description of the person you spoke with:  Sex___male__ Race__asian__ Age __55__
    Height __5'7__   Hair _Black_   Nat'l Origin ___Asian___

    Description of clothes: ___Orange brownish long sleeve shirt and white pants___

    Other characteristics: ___he wore glasses___

Confidential

EXH. NO. _____ FOR I.D
E:
NESS:
PATRICIA L. HUBBARD
CSR NO. 3400

FHC0086

2 5

4.      Description of the rental office:_____n/a_____

_____

5.      Did you see a fair housing poster on display?       θYes          (xNo)

6.      Do you feel the agent treated you courteously?   (xYes)        θNo

Specify why or why not:_____He allowed me to park behind the gate in the

complex and held the door open for me_____

_____

Confidential

FHC0087

7.   Indicate which of the following was either requested by the agent or volunteered by you, by checking the appropriate box.  Each subject must be checked.  Provide a detail of the information in the "Information Given" column.

| Subject | Not Discussed | Requested or Volunteered by Agent | Requested or Volunteered by Tester | Information Given |
|---|---|---|---|---|
| Apartment Size | x | | ✓ | |
| Price Range For an Apt. | DR | | r | $1250.00 a month. With coupon $50.00 off |
| Your Desired Occupancy Date | | | v | Said as soon as possible |
| The Location You Desire | x | | | |
| Your Marital Status | x | | DR | |
| No. of Children You Have | DR | | v | Said the apartment was for me and my son |
| Your Income | x | | | |
| Your Spouse's Income | x | | | |
| Any Pets You Have | x | DR | | |
| Your Employment | DR | r | | Asked what I do for work. Said I do events. |
| Your Spouse's Employment | x | | | |
| Photo Identification | x | DR | | |
| Your Telephone Number | x | | | |
| Your Current Address | DR | r | DR | Asked where I live now? I said Buena Park. |

Other (specify)_____ DR

Page 3 of 13

Confidential

FHC0088

8.  Did the agent state at any time that you might be ineligible to rent an apartment?

θYes  (xNo)    If yes, specify the reason given:_____

_____

9.  When you inquired about the availability of an apartment, what did the agent tell you?
    (Circle the appropriate response.)

    (a.x)   An apartment was available immediately
            (Specify apartment number)_____#2_____

    b.      Several apartments were available immediately
            (Specify apartment numbers)_____

    c.      No apartments were available

10. Did the agent say a unit would become available in the future?
    (Circle the appropriate response.)

    a.      Yes, voluntarily

    b.      Yes, but only after I asked about it

    (c.x)   I did not ask

    d.      I was told nothing was available in the near future

11. How many apartments in all were volunteered to you as serious possibilities?____1____

12. Were you invited to inspect these apartments on the inside?
    (Circle the appropriate response)

    (a.x)   Yes, all of them.

    b.      Yes, but only some of them.  Which ones?_____

    c.      No, but I was shown the model.

    d.      No, I was not invited to inspect any apartments.

13. How many apartments did you actually inspect?____1_____

14. Did the agent accompany you to the apartment(s) inspected?   (xYes)  θNo

15. Did the agent walk through the apartment with you?   (xYes)  θNo

Confidential

FHC0089

16.     Did the agent offer to put your name on a waiting list? (Circle the appropriate response)

        a.      Yes, volunteered the information.

        b.      Yes, but only after I asked about it.

        c.      No, because they do not keep a waiting list.

        d.x     No, because units would be available.

        e.      Other (Specify)_____

17.     If the complex has a waiting list, what kind of form was used?_____N/a

        _____

18.     Did you receive an application?                    xYes   θNo

        a.      Did the agent offer you an application?     θYes   xNo

        b.      Did you ask for an application?             xYes   θNo

19.     What did the agent say about the application or credit check fee?   (Specify amount)

        _____He said the credit check fee was $30 or $45.00 I would have to check with his

        wife Susan, he was not sure_____

        _____

20.     Was security deposit information volunteered by agent?     θYes   xNo
        (Specify amount and any information agent gave.)   He said it would be $400 or $500

        _____

        _____

21.     Did the agent make any racial comments (include code words)?____no_____

        _____

        (If "YES", or "NOT SURE", specify above, what agent said)

Confidential

FHC0090

22.   For each apartment inspected, give the following information:

| Information | 1st Apt. | 2nd Apt. | 3rd Apt. |
|---|---|---|---|
| A. Address | 8142 artesia blvd Buena Park, ca | N/a | N/a |
| B. Apt. No. | #2 | | |
| C. Monthly rental | $1250.00 With $50.00 with coupon | | |
| D. Utilities included | Trash and water | | |
| E. No. of Bedrooms | 2 | | |
| F. Restrictions | none | | |
| G. Security Deposit | $400 or $500 | | |
| H. Date available | Now 1/12/10 | | |
| Describe Apartments (color of carpet, drapes, etc.) | Two bedrooms, master had full bathroom with walk in closet. Tan carpet and wood floors in bathrooms, blinds on windows with balcony off of livingroom, vaulted ceiling in living room | | |

Confidential

FHC0091

23.   For each apartment **not inspected**, but offered as a serious possibility, give the following information:

| Information | 1st Apt. | 2nd Apt. | 3rd Apt. |
|---|---|---|---|
| A. Address | N/a | N/a | N/ |
| B. Apt. No. | | | |
| C. Monthly rental | | | |
| D. Utilities included | | | |
| E. No of Bedrooms | | | |
| F. Restrictions | | | |
| G. Security Deposit | | | |
| H. Date available | | | |

24.   Did the agent speak positively about any unit(s)?   (x Yes)  θ No   If yes, specify: He said it was a nice apartment and big.

25.   Did the agent speak negatively about any unit(s)?   θ Yes  (x No)   If yes, specify:_____

26.   Did the agent show you the facilities (laundry, trash chute, pool, etc.) of the complex?
θ Yes   (x No)   If yes, specify:_____

Confidential

FHC0092

27.    Description of the neighborhood or complex: The complex is brown with light brown trim, big palm tree in front with electronic gate with parking inside.

28.    Did the agent speak positively about the complex or neighborhood?    (xYes)  θNo

If yes, specify: He said this area was highend for this area

29.    Did the agent speak negatively about the complex or neighborhood?    θYes  (xNo)

If yes, specify:

30.    Did the agent mention anything about the lease requirements?    (xYes)  θNo

If so, what did the agent say?:                    They like to have at least a 12 month lease

31.    Did you say you wanted the apartment?    (xYes)  θNo

What did the agent say?    He said it is a good for two adults

What did you say in response to the agent?    I asked for an application.

Confidential

FHC0093

NARRATIVE

Please describe in chronological order the details of your site visit from beginning
to end.   Please be very detailed and include anything which may help you
remember this test later.

I Dawna Rostagno called 714-306-2348 at 12:30 p.m on Tuesday, January 12,
2010 to inquire about a 2-bedroom apartment they have for rent. I said I was driving by last night
and saw the sign. She said she would show it to me. I told her I was on my lunch hour. She said
she would meet me at the complex in a half hour. I said, okay, what is your name? She said
Susan. I said okay, see you then. A few moments later my cell phone rang 714-606-1166, it was
Susan, she said, she her husband will be there at 1:00 p.m. to meet me, he is close by. I said,
okay what is his name? She said Norman. I said okay, I would be there as soon as possible that it
is 12:47 now.  Susan said okay.  As I was parking on the street there was an Asian gentleman
waiving his hands at me to pull in the driveway, so I did. He said, he is Norman and he was
waiting for me, to pull in the gate and park.  The building was brown with light brown trim. It
had a large Palm tree in from of it. There is parking behind the electronic gate.  His car was park
in front of the gate on the left side.  I got out of my car to meet him and said, Hi, I am Dawna,
here to see the 2 bedrooms, I spoke to Susan. I said I am looking for a 2 bedroom for me and my
21 year old son. I said he is disable. Norman stopped before we went to the apartment and said,
how is he disable. Because the apartment is upstairs. I said oh, no, he could walk upstairs. He is
mentally retarded, but he is capabable of walking up the stairs. He said, okay, so he is okay
physically? I said, yes, but he is mentally retarded. As we walked up the stairs, as Norman was
trying to open the door to the apartment (#2) He said, how is retarded? I said mentally. He said,
he could get in trouble for asking, but since I brought it up, he said years ago, there was a lady
who lived here with here retarded son and the cops were called because he went running in the
street. He said he was about 18 or 19 years old. He said he also use to talk and bother the girls in
the complex and it made them feel uncomfortable. That there were problems. He said, is your
son like that? I said, I have not had a problem with my son. That he has a private nurse that stays
with him. He said, so he is at home all day? I said yes.  We then got into the apartment. There
was a Balcony off the living room. It had tan carpet and wood floors in the bathrooms. There was
a bathroom and walk in closet in the master bedroom in the back and a full bathroom in the
hallway. The windows had blinds on them and the living room had a vaulted ceiling. There was a
closet in the living room with shutter like doors. I asked what that was and it was the central air

Confidential

FHC0094

I said this is perfect size apartment for my son and me. He said this is a nice place for two adults. He then asked again, if my son stays home during the day? And I said yes, with his nurse. He said but he is physically okay? I said yes. I said I really like the apartment how much is the rent? He said $1250.00 a month. He said there is a coupon right now for a discount and he thinks it takes about $50.00 off the rent, so it would be about $1200.00 dollars a month. I said and the security deposit. He said $400 or $500, that Susan knows all of that. I said is there a credit check fee? He said yes, there is you will have to ask Susan, I think it is $30.00 or $45.00 to ask her. He said they pay the trash and water. He also said there is a 1 car garage and 1 car space for this apartment. I said it sounds great, I would like to turn in an application do you have one? He looked in the kitchen drawers and could not find one. He said I think I have one in my car. I said great! As we were walking out, he asked again about my son. He said, so is your son like 21 years old, but acts 10 or 15? I said, um, well he is mentally retarded, so yes he is a lot slower then his age. He said, does he act 10 or 15? I said around that. He said, he wouldn't talk to the girls or anything. I said, I have never had any problems with him. So he can physically walk up the stairs? Is he big? I said, he could walk. We then went to his car and he found the application. It was on the seat. He said, here is the application, you can fill it out and then call Susan. He then opened the gate so I can get my car. I said, I would call Susan and fill out the application. Thank you. I left at 1:40 p.m.

_Dawna Estacio_     7/12/10

Confidential

FHC0095

*Allen Hung*
*Fax 714-680-0755*

Application credit check fee $$ . 00  714-738-1001

# TENANT APPLICATION    *714-306-2348 (cell)*

Property Address: _____ Apt. No _____

Name(s) of Applicant(s): _____

Other Name(s) used within last 3 years: _____

Names and Age of other Occupants: _____

_____

_____

Pets (Number & Type): _____

Present Address: _____ City-State _____ zip _____

How long? _____ Reason for leaving: _____

Name and Address of Owner or Owner's Agent: _____ Telephone# _____

Previous Address (Past 3 Years): _____ City-State _____ zip _____

How long? _____ Reason for leaving: _____

Name and Address of Owner or Owner's Agent: _____ TELEPHONE# _____

Previous Address (Past 3 Years): _____

How long? _____ Reason for leaving: _____

Name and Address of Owner or Owner's Agent: _____

**Employment:**

Social Security Number [ ][ ][ ] – [ ][ ] – [ ][ ][ ][ ]    Drivers License Number [ ][ ][ ][ ][ ][ ][ ][ ][ ][ ]

Birth Date (Mo.-Day-Yr.) _____ (State and Expiration Date) _____

Present Employer: _____ How long? _____

Address: _____ Telephone: _____

Employed as: _____ Salary: $ _____ per _____

**Other Occupant:**

Social Security Number [ ][ ][ ] – [ ][ ] – [ ][ ][ ][ ]    Drivers License Number [ ][ ][ ][ ][ ][ ][ ][ ][ ][ ]

Birth Date (Mo.-Day-Yr.) _____ (State and Expiration Date) _____

Present Employer _____ How long? _____

Address _____ Telephone _____

Employed as: _____ Salary: $ _____ per _____

Confidential

FHC0096

Other Income $ _____   Source: _____

Credit References (2): _____

Credit Cards   Issuer _____   Acct. No. | | | | | | | | | | |   Issuer _____   Acct No | | | | | | | |

Name of Bank _____   Branch Address _____

_____

_____

Automobile License No _____   State of Registry: _____

Make & Model: _____   Year: _____   Color. _____

**IN CASE OF EMERGENCY:**

Name of Person to be Informed: _____   Relationship: _____

Address: _____   Telephone _____

## AUTHORIZATION TO VERIFY INFORMATION

I Authorize Landlord or his Authorized Agents to Verify the above information, including but not limited to obtaining a Credit Report and if this application is accepted I agree to execute the residential lease or rental agreement as set forth on the reverse side hereof

Date _____ 19 _____   Applicant: _____

Telephone No. _____   Applicant: _____

RECEIPT FOR DEPOSIT

The undersigned acknowledges receipt of $ _____ in the form of (  ) Cash. (  ) Personal Check

or (  ) _____ payable to _____ as deposit on the above described property

Date _____   Agent _____

Confidential

FHC0097

# EXHIBIT E

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA


FAIR HOUSING COUNCIL OF ORANGE      )
COUNTY, INC, AND ARLENE LEWIS,      )
                                    )
         PLAINTIFFS,                )
                                    )
                                    )
         VS.                        )  NO. SACV10-01079 CJC
                                    )      (RNBX)
                                    )
SAM CHANG AND NINA CHANG, AS        )
CO-TRUSTEES OF CHANG FAMILY TRUST   )
AND SUSAN HUNG,                     )
                                    )
         DEFENDANTS.                )
_____    )


DEPOSITION OF PATRICIA DUDLEY MC NEAL


MONDAY, JULY 11, 2011


REPORTED BY DONNA E. BOULGER, RPR, C.S.R. NO. 6162

```
 1    COUNTY?

 2        A    YES.

 3        Q    ALL RIGHT.  AND DO YOU KNOW HOW SHE MAKES ENDS

 4    MEET?

 5        A    RETIREMENT.

 6        Q    DO YOU KNOW TOBBY LEWIS?

 7        A    YES.  TOBBY.

 8        Q    OH, IT'S TOBBY.

 9             HOW LONG HAVE YOU KNOWN TOBBY?

10        A    SINCE BIRTH.

11        Q    NOW, AT SOME POINT DID MS. LEWIS MOVE IN WITH

12    YOU?

13        A    YES.

14        Q    TELL US ABOUT THAT.  WHEN WAS THAT?

15        A    I BELIEVE IT WAS IN 2009, I THINK.  AND MAYBE

16    IT WAS NEAR THE END OF SPRING.  I DON'T REMEMBER THE

17    EXACT DATE.

18        Q    AND DO YOU KNOW WHY DID SHE MOVE IN WITH YOU?

19        A    SHE WAS --

20             MS. CRISTOL-DEMAN:  OBJECTION.  CALLS FOR

21    SPECULATION.

22    BY MR. NEVINNY:

23        Q    IF YOU KNOW, YOU CAN ANSWER.

24        A    I CAN ONLY GO BY WHAT SHE TOLD ME.

25        Q    SURE.
```

1      A      WHICH WOULD BE HEARSAY.

2      Q      AND THAT'S FINE.

3      A      BUT SHE TOLD ME THAT SHE WAS HAVING PROBLEMS

4  WITH ONE OF HER FAMILY MEMBERS.

5             AND I SUGGESTED THAT -- WELL, THIS IS WHAT I

6  SAID TO HER, I SAID, "I'M AFRAID FOR YOU.  YOU BETTER

7  COME LIVE WITH ME.  THEY DON'T KNOW WHERE I LIVE."

8      Q      OKAY.  SO YOU AND MS. LEWIS AGREED THAT

9  SOMETIME IN THE SPRING OF 2009, SHE WOULD MOVE INTO YOUR

10  HOUSEHOLD?

11     A      YES.

12     Q      OKAY.  THAT'S A VERY KIND FRIEND.

13            AND WHEN -- IF YOU RECALL, WHEN DID SHE AND

14  TOBBY MOVE IN?

15            SHE MOVED IN WITH TOBBY?

16     A      YES.

17     Q      OKAY.  DO YOU RECALL APPROXIMATELY WHEN THAT

18  WAS?

19     A      IT WAS AROUND THE -- I -- MAYBE AFTER THAT

20  PHONE CALL, PROBABLY A WEEK OR TWO LATER, I THINK.

21     Q      OKAY.  AND HOW LONG DID MS. LEWIS AND TOBBY

22  LIVE WITH YOU?

23     A      I THINK ABOUT TWO MONTHS.  TWO MONTHS.

24     Q      AND OTHER THAN TOBBY AND MS. LEWIS AND

25  YOURSELF, WHO ELSE WAS IN YOUR HOUSEHOLD DURING THAT

1    LIVING WITH YOU?

2    **A**    WELL, THERE WERE SEVERAL REASONS.  ONE OF THE

3    REASONS SHE SAID WAS SOME OF THE PEOPLE -- SOME OF THE

4    RENTAL MANAGEMENT OR WHOEVER THEY WERE SAID THAT SHE

5    DIDN'T HAVE ENOUGH INCOME TO RENT SOME PROPERTIES.

6        THEN SOME PROPERTIES, THEY DIDN'T LOOK, YOU

7    KNOW, CLEAN TO HER.

8        AND THEN SOME, SHE SAID THAT THE MANAGEMENT --

9    LET'S SEE.

10    **Q**    IF YOU CAN RECALL THE WORD SHE USED, I --

11    **A**    I CAN'T RECALL THE WORDS SHE USED.  THESE ARE

12    JUST GENERALIZATIONS.

13    **Q**    SURE.

14        WHAT WOULD SHE TELL YOU ABOUT MANAGEMENT,

15    GENERALLY, IF YOU CAN RECALL, AT THESE PLACES SHE WAS

16    LOOKING TO RENT?

17    **A**    THEY WOULD JUST MAKE EXCUSES NOT TO RENT.

18    **Q**    DID SHE TELL YOU WHAT KIND OF EXCUSES?

19    **A**    YES, SHE DID.

20    **Q**    AND WHAT WERE THOSE?

21    **A**    I CAN'T REMEMBER.

22    **Q**    DO YOU RECALL HOW OFTEN YOU SPOKE TO MS. LEWIS

23    ABOUT HER EFFORTS TO FIND AN APARTMENT WHILE SHE WAS

24    LIVING WITH YOU, HOW MANY OCCASIONS?

25    **A**    OH, YOU KNOW, IT WAS CONSISTENT.  SHE WOULD,

1    DIFFICULTIES OBTAINING HOUSING FOR HER AND HER SON.

2          AND TO -- WELL, MY ANALYZATION OF IT, SHE HAD

3    THE INCOME TO AFFORD THESE APARTMENTS.  AND, I MEAN,

4    THERE WAS A LACK OF BASES FOR -- AS FAR AS I'M

5    CONCERNED, THAT SHE WAS DENIED, YOU KNOW, THE RIGHT TO

6    EVEN RENT AN APARTMENT.  SO I SUGGESTED TO HER, YOU

7    KNOW, "YOU NEED TO CALL HUD, FAIR HOUSING."

8     Q    DO YOU RECALL WHEN THAT WAS THAT YOU MADE THAT

9    SUGGESTION?

10    A    NO.

11    Q    CAN YOU TELL ME WHAT YEAR?

12    A    IT WAS AT THE END OF HER STAY WITH ME.

13    Q    AND DO YOU RECALL APPROXIMATELY WHEN SHE MOVED

14   OUT?

15    A    IT SEEMS LIKE THE SUMMER OF 2009.

16    Q    YOU HAD STATED THAT IT WAS YOUR UNDERSTANDING

17   THAT MS. LEWIS HAD THE INCOME TO AFFORD THESE APARTMENTS

18   WHICH SHE WAS LOOKING AT.

19          WHAT WAS YOUR UNDERSTANDING OF MS. LEWIS'S

20   INCOME IN 2009?

21    A    I REALLY DIDN'T HAVE ANY KNOWLEDGE OF HER

22   INCOME, BUT I WAS JUST SURMISING WHAT SHE WAS RECEIVING.

23    Q    OKAY.

24    A    I DIDN'T HAVE ANY IDEA.

25    Q    SO YOU DON'T KNOW WHAT MS. LEWIS'S INCOME WAS

1    WHEN YOU SAW MS. LEWIS?

2        A    WE WOULD SPEAK AND --

3        Q    YOU'D VISIT?

4        A    YES.  WE'D VISIT, SIT AT THE KITCHEN TABLE AND

5    DISCUSS WHAT WENT ON FOR THE DAY.

6        Q    ALL RIGHT.  TOBBY WOULD BE THERE?

7        A    TOBBY WOULD BE THERE WATCHING TELEVISION.

8        Q    I WAS ABOUT TO ASK:  DID YOU DO ANYTHING FOR

9    RELAXATION IN THE EVENINGS WITH MS. LEWIS?  WOULD YOU

10   WATCH TELEVISION TOGETHER?

11       A    WE'D WATCH TELEVISION.  I WOULD BE WORKING.

12   AND, YOU KNOW, SHE -- WE -- TOBB WOULD BE WATCHING

13   TELEVISION AFTER WE WOULD TALK OR SOMETHING, AND ARLENE

14   WOULD GO AND RELAX.

15       Q    AND THEN EVERYBODY WOULD GO TO BED?

16       A    YES.

17       Q    ALL RIGHT.  DO YOU RECALL APPROXIMATELY WHEN

18   WAS LIGHTS OUT IN YOUR HOUSEHOLD?  WHEN WOULD YOU AND

19   MS. LEWIS GO TO BED?

20       A    PROBABLY 9, 10.

21       Q    WHEN MS. LEWIS WAS LIVING WITH YOU, DID YOU

22   EVER HAVE FRIENDS OVER?

23       A    YES.

24       Q    AND WOULD MS. LEWIS JOIN YOU WHEN YOUR FRIENDS

25   WERE OVER?

1    **Q**    DO YOU RECALL WHEN MS. LEWIS TOLD YOU ABOUT

2    SOME OF HER DIFFICULTIES IN FINDING AN APARTMENT, DO YOU

3    RECALL HOW LONG AFTER THAT SHE CONTINUED TO LIVE WITH

4    YOU?

5    **A**    MAYBE ABOUT ANOTHER MONTH, MAYBE.

6    **Q**    NOW, DURING THE TIME THAT MS. LEWIS WAS

7    RESIDING WITH YOU, DID YOU NOTICE ANY CHANGES IN HER

8    BEHAVIOR?

9    **A**    YES.

10    **Q**    TELL US ABOUT THOSE.

11    **A**    WELL, SHE WOULD BE -- AFTER -- SHE WOULD BE

12    KIND OF SLUGGISH.  AND SHE WOULD GO AND LIE DOWN IN HER

13    BED.  AND SHE WOULD KIND -- BE KIND OF DEPRESSED.

14    **Q**    AND HOW COULD YOU TELL ME WAS DEPRESSED?

15    **A**    JUST HER FACIAL EXPRESSION.  SHE DIDN'T WANT --

16    YOU KNOW, WHEN SHE WOULD TALK ABOUT THE SITUATION, SHE

17    WOULD NOT CRY, BUT YOU COULD TELL HER EYES GOT WATERY.

18    **Q**    AND DID SHE TELL YOU SPECIFICALLY WHAT SHE WAS

19    DEPRESSED ABOUT?

20    **A**    ABOUT ALL THE REJECTION SHE WAS RECEIVING.

21    **Q**    DID SHE TELL YOU HOW MANY REJECTIONS THERE

22    WERE?

23    **A**    NO.

24    **Q**    OTHER THAN BEING SLUGGISH AND APPEARING

25    DEPRESSED, DID YOU NOTICE ANY OTHER PHYSICAL SYMPTOMS

```
 1      A     SHE TOLD ME SHE WAS CONTINUING TO DO THE SAME

 2   THING.

 3      Q     OKAY.

 4      A     GO OUT AND SEARCH.

 5      Q     AND EVENTUALLY, DID MS. LEWIS AND TOBBY MOVE

 6   OUT?

 7      A     YES.

 8      Q     AND WHEN WAS THAT?

 9      A     IT COULD HAVE BEEN AUGUST, I THINK.  I DON'T

10   KNOW.

11      Q     OF 2009?

12      A     YES.

13      Q     AND WHAT DID SHE TELL YOU ABOUT WHAT SHE'D

14   FOUND, WHERE SHE'D FOUND TO LIVE, IF ANYTHING?

15      A     SHE TOLD ME SHE JUST GOING TO MOVE INTO A

16   HOTEL.

17            AND I TOLD HER, "YOU DON'T HAVE TO MOVE."  AND

18   I SAID, "YOU'RE WELCOME TO STAY HERE."

19            BUT SHE DIDN'T WANT TO BE AN IMPEDIMENT UPON MY

20   HUSBAND AND MYSELF.  SO SHE DIDN'T WANT TO OVERSTAY HER

21   WELCOME, SO SHE JUST MOVED OUT.

22      Q     DID MS. LEWIS PAY YOU ANY RENT WHILE SHE WAS

23   LIVING WITH YOU?

24      A     NO.

25      Q     DID SHE PAY FOR GROCERIES?
```

1      A    IF THEY WERE OKAY; IF I WAS OKAY.  WHAT WAS

2    GOING ON IN MY LIFE; IN HERS.  OUR FAMILIES.  JUST

3    GENERAL THINGS.

4      Q    ONE OF THE REASONS THAT MS. LEWIS MOVED IN WAS

5    THESE FAMILY ISSUES SHE TOLD YOU ABOUT, CORRECT?

6      A    YES.

7      Q    DO YOU KNOW IF THOSE ISSUES WERE EVER RESOLVED?

8      A    WELL, SHE REMOVED HERSELF FROM THE FAMILY.

9      Q    OKAY.  AND WAS MS. -- YOU WERE -- YOU'VE KNOWN

10   MS. LEWIS FOR APPROXIMATELY 40 YEARS.

11         DID SHE SEEM UPSET ABOUT THAT?

12     A    WELL, DISAPPOINTED.

13     Q    DISAPPOINTED?

14     A    UH-HUH.

15     Q    AND SHE WAS DISAPPOINTED ABOUT HER FAMILY

16   SITUATION DURING THE TIME THAT SHE WAS LIVING WITH YOU?

17     A    DISAPPOINTED.

18     Q    IS THAT TRUE, SHE WAS DISAPPOINTED ABOUT HER

19   FAMILY SITUATION DURING THE TIME SHE WAS LIVING WITH

20   YOU?

21     A    JUST -- YES.

22     Q    AND DO YOU KNOW WHETHER SHE'S HAPPIER ABOUT HER

23   FAMILY SITUATION TODAY?

24         HAVE THOSE ISSUES BEEN RESOLVED OR DOES SHE

25   REMAIN DISAPPOINTED ABOUT IT?

```
1              MS. CRISTOL-DEMAN:  OBJECTION.  CALLS FOR

2   SPECULATION.

3   BY MR. NEVINNY:

4       Q   DO YOU KNOW?

5       A   COULD YOU REPEAT THE QUESTION.

6       Q   I'M ASKING WHETHER YOU KNOW WHETHER MS. LEWIS'S

7   FAMILY PROBLEMS HAVE BEEN RESOLVED OR WHETHER SHE'S

8   STILL UPSET ABOUT IT.

9       A   WELL, SHE'S NOT -- I REALLY DON'T KNOW.

10      Q   SHE HASN'T TALKED TO YOU ABOUT FAMILY?

11      A   WE ALWAYS TALK ABOUT FAMILY, BUT I DON'T KNOW

12  IF -- IF SHE'S STILL UPSET OR DISAPPOINTED.  I COULDN'T

13  TELL YOU THAT.

14      Q   DID SHE EVER TELL YOU WHETHER THIS FAMILY

15  RELATIVE WAS ABLE TO FIND HER AFTER SHE MOVED IN WITH

16  YOU?

17      A   THEY WERE NOT.

18      Q   THEY WERE NOT ABLE TO?

19      A   CORRECT.

20      Q   DO YOU KNOW IF MS. LEWIS FELT SAFE LIVING IN

21  YOUR HOUSEHOLD?

22      A   TO ME, SHE DID.  I DON'T KNOW.

23          I FELT SHE WOULD BE BETTER, SAFER THERE, SINCE

24  THEY DIDN'T KNOW WHERE I LIVED.

25      Q   WHEN WAS THE LAST TIME YOU SPOKE TO MS. LEWIS?
```

```
 1    STATE OF CALIFORNIA      )

 2                             )  SS.

 3    COUNTY OF ORANGE         )

 4

 5

 6

 7              I, PATRICIA DUDLEY MC NEAL, HEREBY DECLARE

 8    UNDER THE PENALTIES OF PERJURY OF THE STATE OF CALIFORNIA

 9    THAT  THE FOREGOING IS MY DEPOSITION UNDER OATH; THAT THESE

10    ARE THE QUESTIONS ASKED OF ME AND MY ANSWERS THERETO; THAT

11    I HAVE READ MY DEPOSITION AND HAVE MADE CORRECTIONS,

12    ADDITIONS OR CHANGES TO MY ANSWERS THAT I DEEM NECESSARY.

13              IN WITNESS THEREOF, I HEREBY SUBSCRIBE MY NAME

14    THIS _____DAY OF_____, 20_____.

15

16    2011, AT _____, CALIFORNIA.

17

18

19

20                         _____

21                         PATRICIA DUDLEY MC NEAL

22

23

24

25
```

# EXHIBIT F

1                 UNITED STATES DISTRICT COURT

2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

    FAIR HOUSING COUNCIL OF          )
4   ORANGE COUNTY, INC., AND         )
    ARLENE LEWIS                     )
5                                    )
                                     )
6       PLAINTIFF,                   )         CASE NO.
                                     )         SACV10-01079
7              VS.                   )         CJC (RNBX)
                                     )
8                                    )
                                     )
9   SAM CHANG AND NINA CHANG,        )
    AS CO-TRUSTEES OF CHANG          )
10  FAMILY TRUST AND SUSAN HUNG      )
                                     )
11                                   )
        DEFENDANT(S).                )
12  _____

13

14            DEPOSITION OF ANGELICA CORONEL

15                   JUNE 28, 2011

16

17

18

19

20

21

22

23   REPORTED BY LORI M. BARKLEY, C.S.R. NO. 6426

24

25

1    **Q.**  Okay, so reading at the beginning of the

2  typewritten text on page 32, it states:  An introductory

3  letter was drafted and sent out via US mail.  Is that

4  referring to a letter to Miss Lewis?

5    **A.**  Yes.

6    **Q.**  Incidentally, the lower right-hand corner, it

7  says time 10.5, and that same figure is repeated for the

8  next three-pages, 33, 34; what does that refer to?

9    **A.**  To the time spent that specific date and

10  including the time that the file was opened.

11    **Q.**  So, then, point five hours?

12    **A.**  Yes.

13    **Q.**  How do you keep track of your time spent on a

14  particular file?

15    **A.**  Increments of fifteen minutes.

16    **Q.**  Are these handwritten timesheets or is it

17  generated on a computer?  Is there a software system?

18    **A.**  No.

19    **Q.**  So how do you keep track of your time?

20    **A.**  The time that it takes us to do the -- the

21  interview that Miss Lewis, it would be approximately an

22  hour, because we get the information that she gives for

23  her intake; we also do the property search and create

24  the file, so that's a couple hours.  This specific

25  supplemental contact sheet, it includes me going to the

1    site, preparing the test, and discussing the file with

2    my supervisor.

3        Q.   Right, so my question is, how do you keep track

4    of that time?  Do you write it down somewhere or is it

5    just on this supplemental contact sheet that you write

6    it down?

7        A.   Just on this supplemental contact sheet.

8        Q.   So how do you know, on the supplemental contact

9    sheet, you spent ten point five hours somewhere; do you

10   keep records of those increments?

11       A.   From the time you spend on other files, you

12   combine the time that you spent doing on what file, so

13   if you spent half an hour, I'm just estimating the time

14   that is spent.

15       Q.   And, again, where do you keep track of this time

16   for this Lewis file; where is that kept?  Is it in a

17   drawer in your desk?  Is it a handwritten timesheet?  Is

18   it on a computer screen?

19       A.   In my head.

20       Q.   So you estimate the time spent based on the

21   hours you spend on all your cases, and then you indicate

22   time spent on a particular file?

23       A.   Correct.

24       Q.   At the time you prepared this supplemental

25   contact sheet, had you ever had any conversations with

```
1    Susan Hung?

2        A.    From the date of the supplemental contact sheet?

3        Q.    As of January 12th, 2010, had you ever spoken

4    with or had any correspondence with Susan Hung?

5        A.    I spoke with her on January 12th, 2010.

6        Q.    On this day?

7        A.    Yes.

8        Q.    And that's reflected on the next page, 0033,

9    that you spoke to her by telephone?

10       A.    Yes.

11       Q.    And did you not meet with Miss Hung that day?

12       A.    No.

13       Q.    So on page 0033, where it says:  Today, January

14   12, 2010, this is the second paragraph:  I drove to the

15   subject property, you in fact undertook that

16   investigation on that day, January 12th, 2010?

17       A.    Yes.

18       Q.    It states here that you called the manager, and

19   I'll quote you so I don't misstate what you've written

20   here:  "I did not get an answer so I recorded with phone

21   camera the names posted on that calling box list because

22   they were difficult to see on a picture.  The majority

23   of those names seemed to be Korean, Vietnamese, or

24   Chinese?"

25             Do you see that?
```

1      **Q.**   So Miss Coronel, you prepared exhibit 15, this

2   damages worksheet?

3      **A.**   Yes.

4      **Q.**   And when did you prepare it?

5      **A.**   I don't recall.

6      **Q.**   You see the small print date at the bottom, very

7   bottom of the page in the center; would that refresh

8   your recollection as to when you prepared it?

9      **A.**   It's dated on January 12, 2011, but I don't know

10   if that was the date that it was completed.

11      **Q.**   Okay.  Do you believe you may have completed it

12   before that date or more recently, if you recall?  I'm

13   asking for your best recollection.

14      **A.**   I don't recall.

15      **Q.**   Do you recall having prepared this document

16   within the last thirty days?

17      **A.**   No.

18      **Q.**   So it was before that?

19      **A.**   Yes.

20      **Q.**   Where did you obtain the information to be

21   included in this damages worksheet, exhibit 15?

22          MS. CRISTOL-DEMAN:  Objection, overbroad.

23   Compound and complex.

24   BY MR. NEVINNY:

25      **Q.**   Let's break it down.  With respect to the first

1      Q.    And, again, how would you gather this

2    information?  Would you go to Ms. Cato and ask, "How

3    many hours did you spend on the Lewis file?"  Or how

4    does that work?  How do you compile these hours for

5    staff and counselor, investigator, et cetera?

6      A.    Usually we don't discuss files more than an hour

7    during our case review, so the period of that time, till

8    now, we have been discussing Miss Lewis's file after

9    filing.

10     Q.    Again, the question is, how do you get the

11   number of hours worked from the various staff,

12   including, in this case, the COO and CEO; how do you

13   obtain that information?

14     A.    For the investigator, we have supplemental

15   sheets.

16     Q.    Right, they're on your supplemental contact

17   sheets.

18     A.    Yes.

19     Q.    And you have your hours, I know that; you put it

20   in here.  How do you get the information for -- let me

21   break it down.  How do you get the number of hours to

22   put on the damages sheet for the CEO?

23     A.    We add the time that we discussed case review,

24   that gets added.

25     Q.    And who keeps track of that time?

1    **A.**   I did.

2    **Q.**   You do?

3    **A.**   (Whereupon the witness nods her head in the

4    affirmative.)

5    **Q.**   Do you keep a written file that keeps track of

6    that time?

7    **A.**   Not sure if it's on the file after filing.

8    **Q.**   Do you have anything in the case file that's in

9    front of you that keeps track of the number of hours

10   expended by the CEO on the Lewis file?

11   **A.**   No.

12   **Q.**   The next category is "future monitoring," and it

13   says "testing 20" and then the rate is $400 and the

14   total is $8,000.  Do you see that?

15   **A.**   Yes.

16   **Q.**   How do you calculate the number of hours

17   required for testing, or how did you in this case for

18   the Lewis file?

19   **A.**   Denise Cato would be able to answer that

20   question.

21   **Q.**   Same question with respect to the next figure,

22   "staff time-investigator," ten hours, years, five years,

23   can you tell me where you obtained that information?

24   **A.**   I'm sorry, can you repeat the question?

25   **Q.**   Sure, the next line item where it says "50"

```
1    STATE OF CALIFORNIA        )

2                               )  SS.

3    COUNTY OF LOS ANGELES    )

4

5              I, Angelica Coronel, hereby declare under

6    the penalties of perjury of the State of California that

7    the foregoing is my deposition under oath; that these

8    are the questions asked of me and my answers thereto;

9    that I have read my deposition and have made

10   corrections, additions or changes to my answers that I

11   deem necessary.

12              In witness thereof, I hereby subscribe my name

13   this _____day of _____, 20____.

14

15

16

17        _____.

18              Angelica Coronel

19

20

21

22

23

24

25
```

# EXHIBIT G



| | A | B | C | D | E | | F |
|---|---|---|---|---|---|---|---|
| 1 | | | Fair Housing Council of Orange County Damages Worksheet | | | | |
| 2 | | | 8021 4th Street, Buena Park Apartments | | | | |
| 3 | | | Arlene Lewis 09-022 | | | | |
| 4 | | | | | | | |
| 5 | Staff Time | | | Hours | Rate | | $ |
| 6 | | | Counselor | 0.4 | $ | 14.50 | $ 5.80 |
| 7 | | | Investigator | 22.3 | $ | 75.00 | $ 1,672.50 |
| 8 | | | COO - | 4 | $ | 250.00 | $ 1,000.00 |
| 9 | | | | | | | |
| 10 | | | Attorney | 2 | $ | 300.00 | $ 600.00 |
| 11 | | | | | | | |
| 12 | Tenant Survey | | | 26 | | | |
| 13 | | | copies | 78 | $ | 0.30 | $ 23.40 |
| 14 | | | evelopes/labels | 26 | $ | 0.50 | $ 13.00 |
| 15 | | | postage | 26 | $ | 0.41 | $ 10.66 |
| 16 | | | | | | | |
| 17 | Testing | | | 1 | $ | 400.00 | $ 400.00 |
| 18 | | | | | | | |
| 19 | After filling | | | Hours | Rate | | $ |
| 20 | | | Investigator | 9 | $ | 75.00 | $ 675.00 |
| 21 | | | CEO - | 4 | $ | 250.00 | $ 1,000.00 |
| 22 | | | | | | | |
| 23 | Future Monitoring | | | # | | | |
| 24 | | | Testing | 20 | $ | 400.00 | $ 8,000.00 |
| 25 | | | 2 tests per year for 5 years | | | | |
| 26 | | | including sister complex | | | | |
| 27 | | | Staff Time-Investigator | 50 | $ | 75.00 | $ 3,750.00 |
| 28 | | | 10/hrs year 5 years | | | | |
| 29 | | | | | | | |
| 30 | Public Education & Outreach | | | | | | |
| 31 | | | Estimated costs: | | | | |
| 32 | | | PSA | | $ | 2,000.00 | $ 2,000.00 |
| 33 | | | envelopes / | 130 | $ | 0.50 | $ 65.00 |
| 34 | | | Brochures/mailouts | 390 | $ | 0.50 | $ 195.00 |
| 35 | | | Postage | 130 | $ | 0.41 | $ 53.30 |
| 36 | | | Newspaper Ads | | $ | 700.00 | $ - |
| 37 | | | Staff Time-Clerical | 100 | $ | 35.00 | $ 3,500.00 |
| 38 | | | 20/hrs year 5 years | | | | |
| 39 | | | Staff Time-Investigator | 50 | $ | 75.00 | $ 3,750.00 |
| 40 | | | 10/hrs year 5 years | | | | |
| 41 | | | Staff Time-Attorney | 15 | $ | 300.00 | $ 4,500.00 |
| 42 | | | 3/hrs year 5 years | | | | |
| 43 | | | | | | | |
| 44 | Management Education | | | | Charged each year attended | | |
| 45 | | | $200 each person/5 years | 15 | $ | 200.00 | $ 3,000.00 |
| 46 | | | | | | | |
| 47 | | | | | | | |
| 48 | Total Demand | | | | | | $ 34,213.66 |

EXHIBIT: 15
DEPONENT: Corone1
DATE: 6-28-11
7/12/2011
LORI BARKLEY, CSR #6426

FHC 126 Page 1

Fair Housing Council Confidential

Attorney-client communications redacted.

| Date | Damage work Sheet / File #09-022 Arlene Lewis | Hours |
|---|---|---|
| 12/14/2009 | Complaint file - LJT Counselor | 0.20 |
| 12/14/2010 | Initiate and answers clients, Client counseled and documentation - Investigator |  |
| 1/12/2010 | Direct, Atty., Ltr. Prepared and review file, property search - Investigator | 1 |
| 1/12/2010 | Prepared property search and did map request for directions, drove to property to determine of layout and units- did phone contact at site to check on availability - drove back to office and prepared on-site - results support allegations - Investigator / Denise Y. Cato | 10.5 |
| 1/12/2010 | Reviewed file, prepared an additional phone test - called testers both are available - Investigator | 0.75 |
| 1/19/2010 | Comparison report completed results support - called client wants to move forward with HUD complaint for, prepared HUD complain for FHCOC and client - Investigator | 4.75 |
| 1/20/2010 | Client came in to sign HUD complaint - prepared letter to Paul Smith - HUD sent out via mail - Investigator | 0.5 |
| 2/5/2010 | Made changes to FHCOC HUD complaint - discussed file with Denise Y. Cato - Ms. Cato reviewed and sign FHCOC HUD complaint - mail out done - letter prepared for Paul Smith and HUD complaint sent out via mail - Investigator / CEO | 0.5 |
| 5/20/2010 | Lopez has complaint now. Talk to Chris Brancart - Investigator / Atty | 6 |
|  | **Damages after file was filed** |  |
| 8/5/2010 | Received documentation from Chris - case has been filed in court - information discussed - Investigator | 3 |
| 8/25/2010 | Received via email a pdf file on answer filed by defense. Investigator | 1 |
| 9/27/2010 | Reviewed file - discussed on case review - File is now with DFEH - Investigator/Denise Y. Cato / Attorney | 0.5 |
| 9/29/2010 | A request to discontinue investigation of complaint was received and signed and sent via fax to Ms. Brown - complaint withdraw from DFEH. Investigator / Denise Y. Cato | 2.5 |
| 10/19/2010 | Updating activities - Chris Brancart: Notice of case closure received - Investigator | 0.5 |
| 12/1/2010 | Reviewed file - placed call to Chris - Investigator | 0.25 |
| 1/18/2010 | Update file - received voicemail from Chris: - Investigator | 0.25 |
| 12/14/2010 | Received an email from Chris Brancart - Investigator | 0.25 |
| 1/12/2011 | Updating info - emails from Chris. - case review / discussed file / information requested from Chris Brancart - Investigator/CEO | 0.25 |
|  |  | 4 |
|  | **Total** | 35.70 |

FHC 127

# EXHIBIT H

1                    UNITED STATES DISTRICT COURT

2              FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

     FAIR HOUSING COUNCIL OF        )
4    ORANGE COUNTY, INC., AND       )
     ARLENE LEWIS                   )
5                                   )
                                    )
6       PLAINTIFF,                  )        CASE NO.
                                    )        SACV10-01079
7                                   )        CJC (RNBX)
                 VS.                )
8                                   )
                                    )
9    SAM CHANG AND NINA CHANG,      )
     AS CO-TRUSTEES OF CHANG        )
10   FAMILY TRUST AND SUSAN HUNG    )
                                    )
11                                  )
        DEFENDANT(S).               )
12   _____

13

14               DEPOSITION OF DENISE CATO

15                    JUNE 28, 2011

16

17

18

19

20

21

22

23   REPORTED BY LORI M. BARKLEY, C.S.R. NO. 6426

24

25

1    contact sheet?

2        A.   Yes.

3        Q.   All right, so at the initial meeting with Ms.

4    Coronel, you reviewed this document?

5        A.   Yes.

6        Q.   Would you have reviewed the statement from Miss

7    Lewis at that time well?

8        A.   Yes.

9        Q.   So you discussed with Ms. Coronel the three

10   different rental On-sites that she refers to in exhibit

11   4, page 33?

12       A.   Yes.

13       Q.   Do you recall anything else you discussed other

14   than the testing?

15       A.   No.

16       Q.   Do you maintain records of the time that you

17   spend on particular files?

18       A.   I believe I did at that particular time.  We no

19   longer do that now that we have the log.

20       Q.   I thought the log was referring to your weekly

21   case reviews.

22       A.   Yes.

23       Q.   And in your weekly case reviews, you're saying

24   that there is a notation of time spent on files?

25       A.   No.  It's just that before I -- the COO came

```
 1    into the office, I spent more time in Enforcement where

 2    they could just knock on my door and come in, and I

 3    would have a notebook and write down the different

 4    times, so I could give it to them so they could document

 5    it in their file.  Now that I have a COO, the only time

 6    I usually review a file or discuss a file is in case

 7    review, and then we have the logs, and they document it

 8    through their file at that particular time when we are

 9    going through case review.

10        Q.   Okay, so in January 2010, you kept track of your

11    time, yourself?  This was before March 2010, when

12    Ms. Drum came and she began keeping case logs?

13        A.   Yes, I usually did.

14        Q.   And how would you do that:  On your computer, on

15    a handwritten sheet of paper?

16        A.   Notebook that said "discrimination."

17        Q.   Do you keep those notebooks?

18        A.   No.

19        Q.   You discard them?

20        A.   Yes.

21        Q.   How often?

22        A.   Whenever they fill up.

23        Q.   There's no other records maintained; those notes

24    aren't typed up?

25        A.   No.
```

1      Q.    They aren't backed up in any way?

2      A.    No, because the conversations that I have with

3  the counselors, they're to document it in their files.

4      Q.    So today, since you don't keep handwritten

5  notations of your time on your own notebook, you do not

6  keep track of your time spent as CEO and President, is

7  that not part of hourly work?

8      A.    No, I don't have to keep track of that.

9      Q.    So you no longer keep track of your time?

10     A.    That's not what you said.  You said did I keep

11  track of the time that I spend documenting cases,

12  basically.  Isn't that what you asked me?

13     Q.    I'm trying to understand.  You used to keep a

14  notebook where you would write the time spent on various

15  matters.  You no longer maintain such a notebook.  Time

16  is kept track of in case logs.  Do I have that correct?

17     A.    No.  We have case logs now that we use and the

18  time is documented at that particular time.  For every

19  file that we pull up, the counselors are supposed to

20  document the times that are being kept.  It's more --

21     Q.    So how would Ms. Drum know how much time to

22  allot to your time spent on a file in the case logs?

23     A.    Because I'm sitting there.  The counselors are

24  documented.  When they pull a case up, if we're talking

25  about that particular case, within fifteen minutes

1    interim, they know how long we've talked about the

2    particular case, with my time spent there.  That's

3    what's documented in their files.

4         Q.   So Ms. Drum keeps track of your time spent on

5    particular files at case review meetings?

6         A.   No.  Each counselor does.  If I'm talking about

7    Angie's case, then Angie's going to keep track of the

8    time that I'm discussing that particular case with her.

9    A log just basically talks about the next step, or the

10   steps and things that we're doing with her particular

11   case, but it does not document the time.

12        Q.   Oh, okay, I think I understand.  So you don't

13   maintain time sheets today?

14        A.   No.  For me?

15        Q.   Correct.

16        A.   No, I don't.

17        Q.   I'd like to hand you what we've marked as

18   exhibit 8, which is the Statement of Facts, which is

19   actually the Statement of Facts which was attached to

20   the housing discrimination complaint filed on behalf of

21   Miss Lewis and her son; do you see that?

22        A.   Yes.

23        Q.   Before such statements are finalized and

24   attached to a complaint filed or submitted to the HUD,

25   do you review them?

1     A.    Not time sheets.  Maybe just the time, yes.

2     Q.    Notations?

3     A.    Notations, or she had them on her own.  She

4   could have been sitting there with me or we could have

5   been sitting in case review.

6     Q.    And then the next line item for:  Attorney, two

7   hours at $300 an hour, do you know what that line item

8   refers to?

9     A.    Yes.

10    Q.    And Ms. Coronel testified to that.  I don't

11  recall the name.  Elder?

12    A.    David elder.

13    Q.    Is that correct?

14    A.    Yes.

15    Q.    Does Mr. Elder present time sheets for the Fair

16  Housing Council for the time he spends on matters?

17    A.    A monthly invoice.

18    Q.    So he keeps track of time by file, monthly?

19    A.    No.  It was just a monthly invoice.  He's a

20  consultant, so he puts just so many hours into the

21  agency, and at that particular time, he sat with us for

22  every case review.

23    Q.    So does Mr. Elder allot specific time in his

24  invoices to specific files?

25    A.    No.

```
 1    category, on exhibit 15, it's 1, which I understand from

 2    Ms. Coronel is not to represent hours, but one test at

 3    $400.  Do you see that?

 4        A.   Yes.

 5        Q.   Now, my understanding was that testers are paid

 6    $40 to $45 per assignment; is that your understanding?

 7        A.   Depending on the contract.  Different contracts

 8    pay different amount, but for this one, it would have

 9    been paid within that range.  I would say $42.50 to $55.

10        Q.   So under this category, testing, that might

11    represent eight or ten visits; is that correct?

12        A.   Sorry?

13        Q.   That $400 might represent eight to ten visits at

14    $42.50 to $55 an hour; is that your understanding?

15        A.   No, that $400 is $400 per test.

16        Q.   Correct.

17        A.   Yes.

18        Q.   But a tester is only billing out at $42.50 to

19    $55 per assignment, so I'm wondering what is included in

20    one test; what does that mean?

21        A.   It would be the recruiting of testers, the

22    training of testers, the materials testers are given,

23    that's the $400.

24        Q.   And how does that relate specifically to the

25    Lewis matter on 8021 4th street, Buena Park?
```

1       **A.**    Yes.

2       **Q.**    And under "testing" we have $20 at $400 an hour

3    for $8,000.  Can you tell me --

4       **A.**    What did you say?

5       **Q.**    Under the "testing" line, the line item, it says

6    twenty hours.

7       **A.**    No, that's not twenty hours.

8       **Q.**    That's twenty tests?

9       **A.**    That's twenty tests.

10      **Q.**    So even though the column is entitled "hours,"

11   that's not referring to hours?

12      **A.**    Right.

13      **Q.**    Although sometimes it is referring to hours?

14      **A.**    Yes.

15      **Q.**    And other times it's referring to an item?

16      **A.**    This is item, twenty tests.

17      **Q.**    So how do you calculate the number of tests to

18   allocate for a particular file for future monitoring?

19   How do you come up with the twenty?

20      **A.**    It's two properties, two tests per year at each

21   property, times five.

22      **Q.**    And, again, that $8,000 would include charges

23   for training your testers and training materials,

24   correct?

25      **A.**    Yes.

```
 1      A.    Yes.

 2      Q.    So my question was, how do you get to fifty?

 3      A.    Are you talking about the fifty hours?

 4      Q.    Staff time-investigator --

 5      A.    Staff hours.  We basically go on the amount of

 6   units.  It definitely would be more time if it was a

 7   unit, one unit that had a hundred properties -- I mean a

 8   hundred apartments, we would probably test it more than

 9   the two times.

10      Q.    Do you know how many units were at the 8021 4th

11   street property?

12      A.    I just know it was small.

13      Q.    Do you know how many unit were at the 8421

14   Artesia Boulevard property?

15      A.    I just know they were small complexes.

16      Q.    And what do you characterize as small?

17      A.    Anything under 32.

18      Q.    Next under the category entitled "public

19   education and outreach," there's a line item for PSA,

20   $2,000.  Can you tell me what that refers to?

21      A.    PSAs would be the radio stations that would

22   basically cover Buena Park once a year that we would

23   probably put out a bulletin about:  If you feel you've

24   been discriminated by race, color, religion, sex, to

25   contact our agency within Buena Park area.
```

1   volunteers are given a project, there's no time that has

2   to be kept for them, but a staff person has to divide it

3   up into their particular time.

4       Q.   Okay, so do your staff and clerical keep track

5   of their time on an hourly basis?

6       A.   Yes, for our contracts.

7       Q.   How do they maintain those records?

8       A.   I believe they're kept in our time sheets.

9       Q.   So they're FHC time sheets for the Orange County

10  facility?

11      A.   It would say CDBG contract, time spent with this

12  contract, time spent, but it's not going to say

13  basically making materials but that's what the outreach

14  person does.

15      Q.   And who is the outreach person?

16      A.   Violet.

17      Q.   Rodriquez?

18      A.   Yes.

19      Q.   So when staff keeps track of their time on these

20  time sheets relating to specific contracts, do they

21  identify a case file that they spend time on or just

22  generally spending time on this contract?

23      A.   A person that deals with outreach wouldn't be

24  dealing with a particular case file.  They're given a

25  project and say:  We need this and these are the

1    under public education and outreach; does she maintain

2    her time separately?

3        A.    What do you mean, public?

4        Q.    See the category --

5        A.    From the testing?  It -- yes, the testing is

6    totally different, because with the testing, it's a case

7    put together, so she's going to put how much time she

8    spent doing profiles, how much time she might have spent

9    sending the test out or debriefing the testers or doing

10   the comparison form.  When she is monitoring, she's not

11   keeping the same type of time, and the 50 hours is very,

12   very low for what has to be done in a five-year time to

13   make sure they're up with the content decree.

14       Q.    The next line item at 41 is:  Staff

15   time-attorney, fifteen hours at $300 an hour, totaling

16   $4,500.  Do you see that?

17       A.    Yes.

18       Q.    Can you tell me how that number was arrived at?

19       A.    That's an estimate.

20       Q.    And staff time, attorney refers to somebody like

21   Mr. Elder who works in FHC?

22       A.    No, Mr. Elder isn't there, but so we have a

23   staff attorney that reviews our files, basically, that's

24   not getting paid.

25       Q.    And then, finally, the last a category's

```
 1    STATE OF CALIFORNIA        )

 2                               )  SS.

 3    COUNTY OF LOS ANGELES      )

 4

 5               I, Denise Cato, hereby declare under the

 6    penalties of perjury of the State of California that the

 7    foregoing is my deposition under oath; that these are

 8    the questions asked of me and my answers thereto; that I

 9    have read my deposition and have made corrections,

10    additions or changes to my answers that I deem

11    necessary.

12               In witness thereof, I hereby subscribe my name

13    this _____day of _____, 20____.

14

15

16

17         _____.

18                    Denise Cato

19

20

21

22

23

24

25
```