# EXHIBIT A

```
 1

 2                    UNITED STATES DISTRICT COURT

 3                    CENTRAL DISTRICT OF CALIFORNIA

 4
      FAIR HOUSING COUNCIL OF  )
 5    ORANGE COUNTY, INC. and  )
      ARLENE LEWIS,            )
 6                            )
                    Plaintiffs,  )
 7                            ) No.  SACV 10-01079-CJR
             vs.              )
 8                            )
      SAM CHANG and NINA CHANG,)
 9    as Co-Trustees of CHANG  )
      FAMILY TRUST and SUSAN   )
10    HUNG,                   )
                            )
11                  Defendants.  )
      _____)

12

13                  DEPOSITION OF:  ARLENE LEWIS

14             TAKEN ON:  WEDNESDAY, JUNE 29, 2011

15

16

17

18

19

20

21

22

23

24    REPORTED BY:

25    PATRICIA L. HUBBARD, CSR #3400
```

```
 1    years.
 2              Then for two months I went to live with a
 3    friend -- with some friends.
 4         Q.   Okay.  And was that Ms. McNeal?
 5         A.   Yes.
 6         Q.   Okay.  In the early part of 2009 where
 7    were you living?  Were you living in Los Angeles or
 8    Orange County?
 9         A.   Los Angeles.
10         Q.   He was Mr. Hertze your landlord?
11         A.   Yes.
12         Q.   Okay.  So at some point in 2009 did you
13    move to Orange County?
14         A.   Yes.
15         Q.   And what were the circumstances?  What
16    were the reasons for your move?
17         A.   I wanted to -- I wanted to get away from
18    my son.  I didn't want him to come over anymore.  So
19    if he didn't know where I lived, he wouldn't know
20    where I -- he couldn't come over.
21         Q.   Which son was that?
22         A.   The 31-year old.
23         Q.   Tommy Joseph?
24         A.   Yes.
25         Q.   All right.  I don't want to pry.
```

1      **Q.**   Okay.  So, what month in 2009 did you move

2   to Orange County?

3      **A.**   June -- the month of June I moved to

4   Orange County.

5      **Q.**   For the record, the witness just appeared

6   to be signing to her son.

7           Does your son have a hearing disability?

8      **A.**   No.

9      **Q.**   Oh, okay.

10          So, in June 2009 you moved down to Orange

11   County with your son?

12     **A.**   Yes.

13     **Q.**   With Tobby?

14     **A.**   Yes.

15     **Q.**   And where did you reside at that time?

16     **A.**   In Fullerton.

17     **Q.**   Did you rent an apartment at the time?

18     **A.**   No.

19     **Q.**   With whom were you living?

20     **A.**   With Patricia McNeal and Lawrence McNeal.

21     **Q.**   And you and Tobby were both residing at

22   the McNeals' residence?

23     **A.**   Yes.

24     **Q.**   Was that an apartment or a house?

25     **A.**   A house.

```
 1    would give me the PennySaver booklet with rental

 2    properties.

 3              I would make appointments, pay money for

 4    applications, and I would be told the apartment has

 5    been rented.  And it was an ongoing thing.

 6              And I couldn't understand why, because I

 7    have good credit, no criminal background.  I had the

 8    means -- the financial means.  I had all the

 9    qualifications to get an apartment, and I couldn't get

10    one.  Didn't know why.

11        Q.   How many times between June 2009 and

12    November 2009 were you turned down seeking an

13    apartment?

14        A.   Well, estimating, approximately 20 times.

15        Q.   20 times?

16              And what neighborhoods were you looking

17    for an apartment in those 20 times that you were

18    turned down?

19        A.   Most -- I don't know the limit lines of

20    the cities, but most of them were in Fullerton, Buena

21    Park, and other surrounding cities.  Downey, Norwalk.

22        Q.   During these 20 times, were these actual

23    visits that you made to go look at an apartment on 20

24    occasions?

25        A.   Yes.
```

1          A.    No.

2          Q.    Do you suspect that this particular

3    landlord on Imperial didn't represent to you because

4    your son Tobby is disabled?

5          A.    Yes.  Because he asked about the S.S.I.

6    He asked about his disability.

7          Q.    And then you shared the story with him?

8          A.    Yes.

9          Q.    What did you tell him exactly?

10         A.    Well, I had told him he was disabled.  And

11   so I -- I told him that he was a grown man that was

12   like a good baby.

13              And he -- he was gearing also questions

14   toward my son.

15         Q.    So, what types of questions?

16         A.    How old is he?  Why you get S.S.I.?

17              And I told him that he was disabled.  I --

18   so he -- he -- it appeared he knew the law, in my

19   opinion.

20         Q.    What gave you that impression?

21         A.    Because he said -- he didn't tell me -- he

22   didn't tell me why he waived it.  I think he -- if he

23   told me, if he gave me a reason, I think -- I just

24   think he knew the law.

25         Q.    So he asked you questions geared toward

1    that covered his area.

2              And they didn't send out testers.  I don't

3    know how they did it.  They came to the conclusion

4    that it was inconclusive.

5              I didn't -- I didn't go into the office,

6    because I was getting burned out.

7              My top priority was finding a place to

8    live and not stressing myself out.

9         Q.   Of course.  What month in 2009 did you

10   have that experience with this landlord on Imperial in

11   Downey?

12        A.   Pretty close to the same time I -- I would

13   say within a month that I spoke with the -- what is

14   it?  The defendant.

15        Q.   Okay.  So, approximately October?

16   Approximately?

17        A.   Approximately October or November, around

18   that time.

19        Q.   And did you actually go to the Fair

20   Housing Council's offices in Long Beach to lodge a

21   complaint regarding this particular landlord?

22        A.   No.  I did it over the phone.

23        Q.   All right.  Was it more than one telephone

24   call that you had with F.H.C. Long Beach?

25        A.   I don't remember.  If I got put on hold, I

1              Then all of a sudden he said, "You know, I

2      don't want you here.  I don't want you here because of

3      your son."  That's what he said.

4              So I figured, "Oh, well.  It's his place.

5      What can I do?"

6              So I left.  And I made a -- that's when I

7      made the complaint to the -- over the phone to the

8      Long Beach Fair Housing.

9          Q.   Was this before or after you contacted

10     them regarding the other apartment on Imperial?

11         A.   This was before.

12         Q.   And you spoke to the Fair Housing Council

13     in Long Beach and made a complaint regarding your

14     experience, correct?

15         A.   Yes.

16         Q.   What happened after that with the Fair

17     Housing Council in Long Beach?

18         A.   Inconclusive.

19         Q.   And how did you learn of that?  Who told

20     you?

21         A.   I had got a notice back.  I didn't go into

22     the office to make it formal the way I did here.

23         Q.   Do you recall the name of the person to

24     whom you spoke at the Long Beach Fair Housing Council

25     regarding Orchard Inn?

```
 1    he'll be scaring the neighbors.  The police will be

 2    coming.  He'll be walking around."

 3              And I said, "But he's not -- he's not a

 4    bad person."

 5              And she said, "Well, you know what, I

 6    don't want those kind of people here."  So she says,

 7    "Well" --

 8              So I asked her, I said, "Well, since we

 9    had the appointment, could I -- can we still have the

10    appointment and I'll bring my son with me, and you can

11    see that he's not aggressive?  You'll see yourself

12    that he's a good quiet man."

13              "Oh, no.  Well, I'll tell you what.  I'll

14    talk to my husband, and I'll call you back."

15              I didn't think that she was going to call

16    me back.  I was beginning to leave it as that, oh,

17    well, now I know why -- well, now I believe I know why

18    I was being turned down these other times.

19              So to my amaze, she called me back.  She

20    says, "My husband and I, we decided that because -- we

21    decided not to rent to you, because we don't want

22    retarded people here."

23              And that was -- that was it.

24         Q.  So it's your testimony that Mrs. Hung

25    actually called you back specifically to tell you that
```

```
 1          A.   Yes.

 2          Q.   And was that the same day or a day later?

 3          A.   I don't remember.

 4          Q.   All right.  How long did the second

 5     conversation take?

 6          A.   I don't remember.

 7          Q.   Ms. Lewis, didn't Mrs. Hung call you back

 8     in order to invite you to look at an apartment at her

 9     property?

10              MR. WARD:  Objection.  Misstates the

11     testimony, argumentative.

12              MR. NEVINNY:  I'm asking her if that's

13     what occurred.

14              THE WITNESS:  It's not the way you word

15     it.

16     BY MR. NEVINNY:

17          Q.   Oh, okay.  Please tell me in your own

18     words what she said.

19          A.   I was supposed to come by and see the

20     apartment.  But she changed her mind.  She didn't want

21     to have an interview with me after she found out my

22     son was retarded.

23          Q.   So on either occasion when you spoke to

24     Mrs. Hung she never invited you to come to the

25     property to inspect an apartment?
```

```
 1                    MR. WARD:  Objection.  Misstates prior

 2      testimony.

 3                    THE WITNESS:  Never confirmed for me come.

 4      BY MR. NEVINNY:

 5          Q.   And the second time she called you back,

 6      it's your testimony that she didn't call you back to

 7      arrange for you to come visit the property?

 8          A.   It was never confirmed.

 9          Q.   Could you answer the question I'm asking?

10               When she called you back, did she not

11      offer to show you an apartment at the property?

12                    MR. WARD:  Objection.  The question is

13      vague and ambiguous.

14      BY MR. NEVINNY:

15          Q.   You can answer if you understand the

16      question.

17          A.   I don't understand the way you're asking.

18      I don't understand.

19          Q.   You had a telephone conversation with

20      Mrs. Hung, and she offered to show you an apartment of

21      the property, but it was not confirmed?  That's your

22      testimony, correct?

23                    MR. WARD:  Objection.  Misstates the

24      testimony.

25      ///
```

1        **A.**    Nothing.  I don't remember, but I probably

2    was still looking for -- in the papers, I was still

3    looking for apartments.  Because I was still in the

4    hotel.

5        **Q.**    So you continued your house search?

6        **A.**    Yes.

7        **Q.**    Now, at that time you said you were still

8    in the hotel.

9              In November 2009 you had moved from the

10    McNeals' residence?

11        **A.**    Yes.

12        **Q.**    Okay.  When was that?

13        **A.**    September the 1st I moved into the Ramada

14    Inn.

15        **Q.**    Where?

16        **A.**    On Imperial in Downey.

17        **Q.**    So let's go back to this last phone

18    conversation with Ms. Hung.

19              You didn't do anything after you hung up

20    the phone with her.  You continued your house search.

21              What happened after that in the ensuing

22    week, say?

23        **A.**    In the ensuing week?

24        **Q.**    Yeah.  In the following week after your

25    experience with Mrs. Hung, what did you do next?

```
 1          A.    I don't remember the date, but I -- I went

 2     to the Orange County Fair Hearing, and I informed her

 3     about Susan.  And I continued to look for an

 4     apartment.

 5          Q.    How long after your telephone conversation

 6     with Ms. Hung did you go to the Fair Housing Council

 7     of Orange County?

 8          A.    The date is on the application.  I don't

 9     remember.

10          Q.    Do you remember approximately how long

11     between the time of that conversation and your going

12     into the Fair Housing Council offices of Orange

13     County?

14          A.    No.

15          Q.    Can you give me an estimate?

16          A.    No.

17          Q.    So it could have been a year later?

18          A.    No.

19          Q.    Okay.  So it was less than a year?

20          A.    Probably -- I don't know, but probably a

21     week or two.

22          Q.    A week or two later?

23          A.    I'm guessing.

24          Q.    Okay.  Well, I don't want you to guess.

25                Is it your estimate that it was a week or
```

```
 1        A.   Because she then said, "S.S.I.?  S.S.I.?

 2   What is wrong with him?"

 3             And that to me was sending to me that she

 4   had negative vibes about S.S.I. when she said "What's

 5   wrong with him?"

 6        Q.   So then the next line says,

 7                  "I said she didn't like it" -- "like

 8                  to rent to people with" -- I'm not

 9                  quite sure -- "with S.S.I."

10             So the next sentence reads,

11                  "I said she didn't like to rent to

12                  people with S.S.I."

13             You see that sentence?

14        A.   Which paragraph?

15        Q.   The last paragraph on the first page.

16        A.   She then sounded unimpressed.  I said --

17        Q.   So here's what I'm trying to understand

18   about what you wrote here.

19             When she sounded unimpressed, you then

20   told her she didn't like to rent to people with

21   S.S.I.?  Is that what occurred?

22        A.   No.  It was an error in writing.

23        Q.   Okay.

24        A.   That's -- she -- it should have been she

25   said.  It should have been she said.
```

1   types of damage she's seeking.  And I don't want to

2   guess at her damages claim.  So I don't think I can

3   ask it that open-ended, Counselor.

4            But I will do so in at least one area.

5   BY MR. NEVINNY:

6       Q.   Are you seeking compensation for mental

7   suffering in this case?

8       A.   Yes.

9       Q.   Okay.  After November 2009 did you have

10  any physical symptoms which you attribute to your

11  experience with Ms. Hung?

12      A.   When you mention the dates, I can't

13  remember what occurred on what dates, but I do know

14  after she told me "I don't want you -- I don't want to

15  rent the apartment to you because of your son," on

16  that day is when I -- I felt suffering, whatever day

17  that was.

18      Q.   And how did you feel the suffering?  How

19  did that manifest itself, if you understand?

20           How did you realize that you were

21  suffering?

22      A.   Because over the time I started feeling

23  sick, started having headaches, stomach aches.  When

24  I'd speak with friends, it was hard for me to stay

25  focused on the conversation, because I was thinking

1    about what she told me and how I'm in this room

2    suffering.

3              And it was -- I couldn't -- I couldn't

4    focus right.

5              I picked up 15 pounds because I -- I was

6    eating fast food.  And I started -- I started turning

7    to food for -- to make me feel better.

8              And I was having -- I was having dizzy

9    spells.  And I just felt -- I felt stomach aches.  I

10   just felt -- I just felt sick.  Because my hopes -- I

11   don't know.  My hopes -- she had my hopes built up.

12   And then as it just -- because she was unfair without

13   even giving me a chance -- I just felt real bad about

14   that.

15             Especially when I was in the -- in the

16   apartment with feeling like here it is, I'm locked --

17   I felt like I was lock up in a cage area.  I couldn't

18   do any better.

19             And it was like hard for me to believe I

20   was living like this when I wasn't supposed to be.  My

21   standards -- my standards of living, here I was

22   confined, couldn't do any better, living like an

23   animal.

24             And I just felt like I was the only -- I

25   was just feeling sick.  It was all in me.  It was like

1    replays of what she said to me.  And that's when I

2    started feeling sick and I started noticing the

3    difference in my comprehension, my weight and the way

4    I was feeling and the pains I was suffering.

5             They felt -- they felt physical to me, the

6    stomach aches, the headaches.  I just -- all I can say

7    is I just started feeling sick 24 hours a day.  I

8    wasn't the same person.

9    BY MR. NEVINNY:

10        Q.   Did you seek any medical treatment in

11   connection with all the symptoms you just described?

12        A.   No.

13        Q.   Did you see a doctor in connection with

14   how you felt sick?

15        A.   No.

16        Q.   Have you visited a psychiatrist in

17   connection with how you felt?

18        A.   No.

19        Q.   Have you visited a psychologist in

20   connection with how you felt?

21        A.   No.

22        Q.   Did you start feeling sick immediately

23   after you hung up the phone with Ms. Hung?

24        A.   I started feeling depressed then sick.

25        Q.   Where -- how long before you felt sick?

```
 1              MR. WARD:  Objection.  That's invasive of
 2      the witness's personal privacy, medical privacy.
 3              MR. NEVINNY:  Well, that has to be
 4      balanced against the need for the -- and relevance of
 5      the discovery in this case which is that your client
 6      is alleging mental anguish.
 7              MR. WARD:  Well, certainly -- and to that
 8      extent I think any medication that she's taking for
 9      any conditions that she attributes to the conduct of
10      the defendants would be appropriate, but medications
11      she's taking for any unrelated physical issues would
12      not be relevant.
13      BY MR. NEVINNY:
14          Q.   Well, Ms. Lewis, you're on diabetes
15      medication, correct?
16          A.   Yes.
17          Q.   I'm not asking any questions about that
18      have.
19              I'm asking -- you stated that you
20      experience headaches after your experience -- your
21      telephone call with Ms. Hung.
22              Is that your testimony?
23          A.   Yes.
24          Q.   Do you take any medication in connection
25      with those headaches?
```

1        A.    No.

2        Q.    Do you continue to experience those

3    headaches today?

4        A.    When I have flashbacks, I do.  It's

5    something that didn't leave -- what happened to me

6    didn't leave my mind.  It's still -- sometimes it's

7    like a nightmare and it comes back to me.

8        Q.    How often do you have flashbacks?

9        A.    I can't say.  I don't know.  They just

10   flare up.

11       Q.    When was the last time you had a flashback

12   regarding your experience in this case?

13       A.    Oh, when they told me about the -- they

14   just -- I had one about the deposition.  I had one --

15   I had some this week I know.  Because I had to, you

16   know, talk about -- you know, the memories were

17   brought up more so this week, because I had to go

18   to -- for the deposition that I knew was coming.

19       Q.    So when you say "this week," it's

20   Wednesday today.  Do you mean since Sunday or within

21   the last week, since last Wednesday?

22       A.    Well, I had them anyway, but I just had --

23   I really had one yesterday.

24       Q.    All right.

25       A.    But I have them -- I have them weekly.

1       **A.**   No.

2       **Q.**   Okay.  Other than watching television with

3   your son Tobby, are there any other activities that

4   you engage in together with Tobby?

5       **A.**   We go out to dinner.  We go for walks.

6   And we go house hunting.  Not apartment hunting, but

7   looking at houses.  That's -- that's what I do.

8       **Q.**   Okay.  How often do you go out to dinner

9   with your son Tobby?

10      **A.**   Excuse me.  But those are hard questions

11  for me.  When we feel like it.

12          I cook, but -- we have outings probably

13  about -- it's hard to say.  I can't answer to say when

14  I do it.  We just do it.

15      **Q.**   Is cooking something you enjoy?

16      **A.**   No.  But I do it.

17      **Q.**   Would you say you go out to dinner with

18  Tobby more than once a week?

19      **A.**   I would say once a week we go out to

20  dinner.

21      **Q.**   And how often would you say you take walks

22  with Tobby?

23      **A.**   Sometimes it's daily.  It's hard to say.

24  Sometimes it's every other day.

25      **Q.**   And is that when you actually look at

```
1              I, ARLENE LEWIS, say I have read the

2    foregoing deposition and declare under penalty of

3    perjury under the laws of the State of California:

4              That the foregoing is my deposition under

5    oath;

6              That I have read same and have made the

7    necessary corrections, additions or changes to my

8    answers that I deem necessary;

9              That my answers as indicated are true and

10   correct.

11

12             Executed at _____,

13   California, this _____ day of _____,

14   20_____.

15

16

17            _____

18                   ARLENE LEWIS

19

20

21

22

23

24

25
```